1  LAW OFFICES OF DAWN CEIZLER
   DAWN CEIZLER, Bar No. 214873
2  1990 N. California Blvd., Suite 305
   Walnut Creek, CA 94596
3  Telephone: (925) 932-8225
   Facsimile: (925) 226-4849
4
   Attorney for Plaintiff Phillips 66
5  Company

6

7

8                    IN THE UNITED STATES DISTRICT COURT

9                 FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11 PHILLIPS 66 COMPANY,                    )  Case No.
                                           )
12                        Plaintiff,       )  **COMPLAINT FOR BREACH OF**
                                           )  **CONTRACT AND BREACH OF**
13        vs.                              )  **GUARANTY AGREEMENT**
                                           )
14 REED AVENUE FOODMART, LLC               )  *Unlimited General Civil*
   AND VINOD PAUL,                         )
15                        Defendants.      )
                                           )
16                                         )
                                           )
17 _____)

18

19        Plaintiff Phillips 66 Company ("Phillips 66") alleges against Reed Avenue Foodmart, LLC,

20 and Vinod Paul ("Defendants") as follows:

21                        **GENERAL ALLEGATIONS**

22        1.      Phillips 66 files this Original Complaint complaining of Defendants' breach of

23 contract for failing to timely and fully pay all amounts owed under a Union 76 Branded Reseller

24 Agreement and Personal Guaranty.

25                              **PARTIES**

26        2.      Phillips 66 is a Delaware corporation with its principal place of business in Houston,

27 Harris County, Texas.

28

                    **COMPLAINT FOR BREACH OF CONTRACT**

3.     Reed Avenue Foodmart, LLC, ("Reed Avenue") is an inactive California limited liability company and may be served with process by serving its registered agent for service of process, Candace Y. Brooks, Esq., at her place of business, 455 University Avenue, Suite 100, Sacramento, California 95825, or at such other place as she may be found.

4.     Vinod Paul ("Paul") is an individual residing in Sacramento, California and may be served with process at his residence, 550 Hawkcrest Circle, Sacramento, California 95835, or at such other place as he may be found.

## JURISDICTION AND VENUE

5.     Jurisdiction is proper in this Court pursuant to 28 U.S.C. § 1332 because no Defendant is a citizen of the state in which Plaintiff is incorporated or maintains its principal place of business.  Plaintiff Phillips 66 is a corporation incorporated under the laws of the State of Delaware with its principal place of business in Texas.  Defendant Reed Avenue is an inactive corporation incorporated under the laws of California with its principal place of business in California, making it a citizen of California.  The members of Reed Avenue, Vinod Paul and Neerja Kumar, are citizens of California.  Defendant Paul is a resident and citizen of California.  The amount in controversy, without interest, cost, or attorneys' fees, exceeds the amount specified by 28 U.S.C. § 1332.

6.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(1) and (2) because a substantial part of the events or omissions giving rise to the claims occurred in this district.

## BACKGROUND FACTS

7.     Reed Avenue operated a gas station in West Sacramento, California and purchased motor fuels and related products from ConocoPhillips Company ("ConocoPhillips"), as successor to Tosco Corporation by merger.  On or about February 14, 2002, Reed Avenue entered into a ten-year Union 76 Branded Reseller Agreement with ConocoPhillips ("Contract").  A true and correct copy of the Contract is attached hereto as Exhibit A.

8.     Under the Contract, Reed Avenue agreed to promote and sell Union 76 branded motor fuel at its station, including purchasing minimum amounts of Union 76 branded motor fuel for resale and complying with ConocoPhillips' guidelines on operation and image standards.

**COMPLAINT FOR BREACH OF CONTRACT**

9.     On or about July 25, 2002, Vinod Paul executed a personal guaranty under which he absolutely and unconditionally guaranteed the prompt payment of all any and all present and future indebtedness of Reed Avenue to ConocoPhillips ("Guaranty").   A true and correct copy of the Personal Guaranty is attached hereto as <u>Exhibit B</u>.

10.     On or about May 1, 2012, ConocoPhillips spun off its downstream assets into newly formed Phillips 66.   As a result, ConocoPhillips assigned all its rights, title, and interest in the Contract and Guaranty to Phillips 66.

11.     On or about January 1, 2013, Reed Avenue materially breached the Contract by removing the 76 logos, signs, and information decals from its station and ceasing to sell 76 branded motor fuels.   Consequently, Phillips 66 terminated the Contract effective February 11, 2013.   A true and correct copy of the Notice of Termination is attached hereto as <u>Exhibit C</u>.   After the termination, Reed Avenue failed to pay its debt owed to Phillips 66 under the Contract.   *See id*.

12.     On or about March 20, 2013, Phillips 66 sent a written demand to Reed Avenue demanding the full and immediate payment of its outstanding debt to Phillips 66.   A true and correct copy of the demand letter and outstanding invoices, is attached hereto as <u>Exhibit D</u>.

13.     In addition, on or about March 20, 2013, Phillips 66 sent written demands to Paul, as guarantor, demanding the full and immediate payment of Reed Avenue's outstanding debt to Phillips 66.   True and correct copies of the demand letters are attached hereto as <u>Exhibit E</u>.

14.     On or about April 17, 2014, counsel for Phillips 66 sent final demand letters to Reed Avenue and Paul again demanding the full and immediate payment of all of Reed Avenue's outstanding debt to Phillips 66.   True and correct copies of the demand letters are attached hereto as <u>Exhibits F</u> and <u>G</u>.[1]

15.     As of October 13, 2015, Reed Avenue owes Phillips 66 the following amount, exclusive of any applicable interest and attorneys' fees.

| | |
|---|---|
| PSO Maintenance Program Charge | $90.00 |
| Self-Amortizing Principal | $123,786.36 |

---

[1] The letters were sent by certified mail, return receipt requested.  Although the letter to Paul was returned as unclaimed, the letter to Reed Avenue was signed for and delivered.  *See id*.

3

**COMPLAINT FOR BREACH OF CONTRACT**

| | |
|---|---|
| Self-Amortizing Interest | $1,390.48 |
| Liquidated Damages | $281,529.86 |
| Spirit of Performance Charge | $52.00 |
| Reserve Account Credit | ($15,000.00) |
| Credit | ($232.88) |
| **TOTAL** | **$391,615.82** |

True and correct copies of the outstanding invoices and an account summary reflecting the amounts owed are attached hereto as <u>Exhibit H</u>.

16.    To date, Reed Avenue has failed to pay its indebtedness to Phillips 66, and all conditions precedent to this claim have been performed by Phillips 66 or have otherwise occurred.

**COUNT I**
**BREACH OF CONTRACT**

17.    Phillips 66 incorporates herein by reference, as though fully set forth herein, the facts and allegations in all preceding paragraphs.

18.    ConocoPhillips, as successor to Tosco Corporation by merger, and Reed Avenue entered into the Contract under which Reed Avenue agreed to promote and sell Union 76 branded motor fuel.   ConocoPhillips later assigned all of its rights, title, and interest in the Contract to Phillips 66.

19.    ConocoPhillips and Phillips 66 fully performed all their obligations pursuant to the Contract by supplying Reed Avenue the requested products, signs, and equipment and fully performed all their obligations under the Contract.

20.    Reed Avenue breached its obligations pursuant to Sections 5(a)(1), 10, and 11(a) of the Contract by removing the Union 76 logos, signs, and information decals from the station, ceasing to sell 76 branded motor fuels, and failing to pay damages owed to Phillips 66.

21.    As a direct and proximate result of Reed Avenue's breaches as described herein, P66 has suffered $391,615.82 in damages, exclusive of interest and attorneys' fees as allowed by law and Section 41 of the Contract.

4

**COMPLAINT FOR BREACH OF CONTRACT**

22.     Pursuant to Section 41 of the Contract, Phillips 66 is entitled to recover its costs of collection in the event of a breach, including its reasonable and necessary attorneys' fees.  As a result of Reed Avenue's breach of the Contract, Phillips 66 was required to retain legal counsel to file this suit.  In addition to all amounts due under the Contract, Phillips 66 seeks to recover the reasonable and necessary attorneys' fees it incurs in this suit.

**COUNT II**
**BREACH OF GUARANTY**

23.     Plaintiff incorporates herein by reference, as though fully set forth herein, the facts and allegations in all preceding paragraphs.

24.     Paul executed the Guaranty in which he unconditionally guaranteed the full and prompt payment of all Reed Avenue's present and future indebtedness to ConocoPhillips. ConocoPhillips subsequently assigned all of its rights, title, and interest in the Guaranty to Phillips 66.

25.     ConocoPhillips and Phillips 66 fully performed all their obligations pursuant to the Guaranty which resulted in Reed Avenue being indebted to Phillips 66 in the amount of $391,615.82.

26.     Despite Phillips 66's repeated demands, Paul has failed and refuses to pay Reed Avenue's indebtedness to Phillips 66.  Such refusal is a breach of the Guaranty.

27.     As a direct and proximate result of Paul's breach of the Guaranty, Phillips 66 has suffered $391,615.82 in damages, plus interest and attorneys' fees as allowed by law and Section 10 of the Guaranty.

28.     Pursuant to Section 10 of the Guaranty, Phillips 66 is entitled to recover its costs of collection in the event of a breach, including its reasonable and necessary attorneys' fees.  As a result of Paul's breach of the Guaranty, Phillips 66 was required to retain legal counsel to file this suit.  In addition to all amounts due under the Guaranty, Phillips 66 seeks to recover the reasonable and necessary attorneys' fees it incurs in this suit.

**COMPLAINT FOR BREACH OF CONTRACT**

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**CONCLUSION AND PRAYER**

Phillips 66 Company prays that Reed Avenue Foodmart, LLC, and Vinod Paul be cited to appear and answer, and that on a final hearing P66 be awarded a judgment against Reed Avenue Foodmart, LLC, and Vinod Paul, jointly and severally, for $391,615.82 in actual damages, plus reasonable attorneys' fees, costs, and expenses, pre and post-judgment interest allowed by law, and such other and further relief to which it may be justly entitled.

Dated: October 13, 2015

LAW OFFICE OF DAWN CEIZLER

By: _____
    Dawn Ceizler

    ATTORNEY FOR PLAINTIFF
    PHILLIPS 66 COMPANY

6

**COMPLAINT FOR BREACH OF CONTRACT**

# EXHIBIT A



UNION 76 BRANDED RESELLER AGREEMENT
#0045/2639045

## TABLE OF CONTENTS

| SUBJECT | SECTION |
|---|---|
| LICENSE AND STATION | 1 |
| TERM | 2 |
| EQUIPMENT | 3 |
| ELECTRONIC POINT OF SALE EQUIPMENT | 4 |
| SERVICES, OPERATIONS AND IMAGE OF STATION | 5 |
| PROHIBITED USES | 6 |
| FIVE STAR STANDARDS PROGRAM | 7 |
| RIGHT TO OCCUPY STATION | 8 |
| TAXES | 9 |
| TRADEMARKS | 10 |
| MOTOR FUELS BRANDS, GRADES AND QUANTITY | 11 |
| DELIVERY | 12 |
| TITLE TO MOTOR FUEL AND STOCK LOSSES | 13 |
| ALLOCATION | 14 |
| PURCHASE PRICE | 15 |
| TERMS OF PAYMENT AND CREDIT REQUIREMENTS | 16 |
| CREDIT CARD SALES | 17 |
| SIGNS | 18 |
| NO EXCLUSIVE AREA | 19 |
| MAINTENANCE AND REPAIR | 20 |
| TELECOMMUNICATIONS | 21 |
| COMPLIANCE WITH LAWS | 22 |
| ENVIRONMENTAL COMPLIANCE | 23 |
| RECORDS AND AUDITS | 24 |
| INDEMNIFICATION | 25 |
| INSURANCE | 26 |
| TRANSFERS, SUBLETTING AND SALES | 27 |
| TERMINATION BY TOSCO | 28 |
| TERMINATION BY RESELLER/ TOSCO'S PURCHASE OPTION | 29 |
| LIQUIDATED DAMAGES | 30 |
| INDEPENDENT CONTRACTOR | 31 |
| NOTICE | 32 |
| FORCE MAJEURE | 33 |
| REVIEW OF AGREEMENT | 34 |
| SECTION TITLES | 35 |



WAIVER                                              36
WARRANTY AND REPRESENTATIONS                        37
CONFIDENTIALITY                                     38
SEVERABILITY                                        39
SECURITY INTEREST                                   40

LEGAL FEES                                          41
ASSIGNMENT AND MODIFICATION                         42
CHOICE OF LAW AND VENUE                             43
CONTRACTING ENTITY                                  44
EXHIBITS AND PREAMBLE                               45

ENTIRETY                                            46

**EXHIBITS**

Station Location                                   Exhibit A
Equipment Schedule/Signs                           Exhibit B
Hours of Operation                                 Exhibit C
Quarterly /Annual Minimum Volume Schedule          Exhibit D
Petroleum Marketing Practices Act (PMPA)           Exhibit E



# UNION 76 BRANDED RESELLER AGREEMENT
## #0045/2639045

THIS UNION 76 Branded Reseller Agreement ("Agreement") dated <u>February 14, 2002</u> ("Contract Date") is by and between Tosco Corporation, a Nevada corporation ("TOSCO") and the individual(s) and/or entity named below ("RESELLER"):

Reed Avenue Foodmart, LLC

## *RECITALS*

A.    WHEREAS, TOSCO owns and has the right to use and grant licenses and petroleum marketing franchises for the use of certain Union 76 trade name(s), trademark(s) and service mark(s) ("Mark(s)");

B.    WHEREAS, TOSCO owns, licenses, and franchises independent operators, dealers and resellers to use the Mark(s) in connection with the resale of motor fuels, automotive services, lubrication services and oil changes, car washes, convenience stores, and related services through Union 76 branded service stations to the consuming public, which stations include the use of Union 76 proprietary credit card payment system, trade secrets, specialized equipment, stylized station premises, trade dress, slogans, and identification schemes, all of which may be changed, improved, and further developed by TOSCO from time to time (Union 76 Format(s)");

C.    WHEREAS, RESELLER desires to be assisted, trained, authorized and licensed to use the Mark(s) and Format(s) owned by TOSCO, and recognizes and acknowledges the benefits to be derived from being identified with the Union 76 brand and being assisted, trained, and licensed by TOSCO for the use thereof; and

D.    WHEREAS, RESELLER understands and acknowledges the importance of TOSCO's uniform standards of quality, appearance, and service and the necessity of RESELLER to conform to the Union 76 Format(s).

NOW, THEREFORE, in consideration of the mutual undertakings contained herein and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereby agree as follows:

## 1.    <u>LICENSE AND STATION.</u>

(a)    Subject to the terms and conditions of this Agreement and RESELLER's continuing good faith performance, TOSCO hereby grants to RESELLER a non-exclusive license and franchise (hereinafter used as such term is defined under the Federal Petroleum Marketing Practices Act, 15 U.S.C. §2801 *et seq.*, which statute shall hereinafter be referred to as the "PMPA") to establish and operate a Union 76 Service Station utilizing the Mark(s) and Union 76 Format(s) only at the <u>Station Location</u> set forth in **Exhibit A** ("Station").

(b)    The franchise granted herein is for the Station only and nothing herein shall be construed as or shall be a grant of any area, market, or territorial rights; provided, however, RESELLER shall be and hereby is permitted to advertise and solicit business for the Station within any area, market or territory, it being acknowledged and agreed to by RESELLER that other Union 76 branded service station resellers, dealers, car washes, and TOSCO itself may also advertise and solicit business within any area, market or territory inclusive of, but not necessarily limited to, the vicinity of the Station.

(c)    Pursuant to TOSCO's prior written consent, RESELLER may be authorized to own and operate additional service station premises under the Mark(s); provided, however, that said service station premises shall meet or comply with TOSCO's then current standards for the resale of motor



fuels, and if applicable, automotive services, lubrication services, oil changes, and other related services through Union 76 branded service stations to the consuming public.

## 2.   TERM.

(a)    The term of this Agreement commences on <u>May 1, 2002</u> and expires on <u>April 30, 2012</u> ("Term"), subject to the early termination provisions set forth herein.

(b)    TOSCO shall have the right, but not the obligation, to offer to renew the franchise granted herein for one (1) additional term.  RESELLER may accept TOSCO's renewal provided:

(1)    RESELLER shall not have been previously nonrenewed or terminated as provided under applicable law or other terms of this Agreement;

(2)    RESELLER shall, prior to the commencement of such renewal term, execute TOSCO's then current Union 76 branded reseller agreement which shall set forth such renewal terms and conditions;

(3)    RESELLER shall not be in default of any of the terms and provisions of this Agreement, and RESELLER shall have fully and faithfully complied with and performed all RESELLER's obligations hereunder; and

(4)    RESELLER shall, at RESELLER's sole expense, renovate, improve or upgrade the Station so as to conform with TOSCO's then current Mark(s) and Union 76 Formats standards and specifications.

## 3.   EQUIPMENT.

(a)    TOSCO hereby provides to RESELLER the equipment and signage set forth on the <u>Equipment Schedule</u> attached hereto as **Exhibit B** ("Equipment") for use at the Station, now installed or to be delivered and installed by TOSCO to the Station.  Such Equipment and any additions, replacements, or substitutions hereafter made (which may be evidenced by Supplemental Schedules) are also referred to collectively herein as the Equipment.  RESELLER agrees that the Equipment shall remain the personal property of TOSCO and shall not be encumbered, changed, modified, relocated, or removed without the prior written consent of TOSCO.  TOSCO reserves the right at any time to remove from the Station without replacement any item of Equipment deemed by TOSCO as not essential to the operation thereof and, upon expiration, termination and/or nonrenewal of this Agreement, TOSCO shall have the right to enter upon the Station and remove all of the Equipment.

(b)    RESELLER will, at RESELLER's sole expense, make all minor repairs and provide all ordinary maintenance required to keep the Equipment in good operating condition.  TOSCO may, but is not obligated to, make major repairs required to keep the Equipment in good operating condition or replace Equipment, provided that if such repairs are necessitated by the negligence or misuse of RESELLER, of any employee of RESELLER, or of any third party, RESELLER shall be obligated to reimburse TOSCO for the cost of such repairs or replacements.  RESELLER acknowledges and agrees that TOSCO has no obligation to repair or replace under ground storage tanks or lines.  RESELLER agrees that in no event shall TOSCO incur any liability to RESELLER for damages, consequential or otherwise, by reason of the condition of the Equipment or RESELLER's negligence, failure, or delay, regardless of cause, in repairing any of the Equipment, and RESELLER waives all claims for damages resulting therefore or in connection therewith.  Upon termination, expiration and/or nonrenewal of this Agreement, RESELLER agrees to surrender and return the Equipment to TOSCO in as good order and condition as when supplied to RESELLER hereunder, ordinary wear and tear excepted.



4.     **ELECTRONIC POINT OF SALE EQUIPMENT.**

RESELLER acknowledges and agrees that TOSCO shall, at TOSCO's sole determination and expense, install electronic point of sale ("EPOS") equipment for the processing of credit card and debit card transactions. RESELLER shall pay to TOSCO all reasonable charges for the operation and use of said EPOS equipment required by TOSCO, which shall be set forth in an EPOS Equipment Rental Agreement to be executed by RESELLER upon request by TOSCO.

5.     **SERVICES, OPERATIONS AND IMAGE OF STATION.**

(a)     RESELLER recognizes that the Union 76 Mark(s) unique color combinations, Station design and appearance represents an image of high standards of product quality, Station appearance (inside and out) and customer service. Therefore, RESELLER agrees to manage, operate and maintain the Station in a manner which will maintain and enhance the image and which shall in no event detract from or disparage the image and will comply with TOSCO's visual and operational standards as updated from time to time by TOSCO.     In particular, without limiting the foregoing obligation, RESELLER shall do the following at RESELLER's sole cost and expense:

(1)     Operate the Station for the promotion and sale of the branded motor fuels and motor oils and other merchandise, products and services licensed under this Agreement and customarily sold at such facilities, keeping the Station open for continuous operation not less than the hours set forth in the Hours of Operation schedule attached hereto as **Exhibit C**;

(2)     Keep the Station including, but not limited to, the premises, buildings (interior and exterior), restrooms, sidewalks, approaches and driveways in good condition, properly lighted, clean, safe, sanitary and free of trash, rubbish and other debris;

(3)     Keep the approaches, driveways and services areas uncluttered and free of parked vehicles, trailers, and other obstructions, including ice or snow, at all times;

(4)     Render courteous, prompt, efficient and diligent service to customers and provide satisfactory resolution of any customer complaints;

(5)     Maintain sufficiently trained and qualified employees (including RESELLER) who must at all times, while on duty at the Station, be dressed in approved uniforms.  In addition, each employee who, in the course of their employment might be called upon shall communicate with customers, law enforcement officials, fire officials, government officials and other persons who may have business dealings with the Station have the ability to personally understand, write and speak the English language.  RESELLER shall maintain a sufficient number of trained, courteous and neat appearing personnel at the Station required to consistently operate the Station in an efficient and organized manner. RESELLER shall, at TOSCO's request, participate in subsequent training programs as may be offered by TOSCO from time to time;

(6)     Maintain an environmentally compliant and safe place to work for RESELLER's employees and customers, and maintain and operate the Station in compliance with all applicable laws, regulations and rules concerning environmental compliance and safety of the workplace.  RESELLER shall provide all employees with adequate training concerning workplace environmentally compliance, safety and safe work practices.  TOSCO makes no assurances that despite RESELLER's proper maintenance of any and all environmentally compliance and safety practices, use of the environmental compliance and/or safety information or any additional environmental compliance and/or safety measures offered or suggested by TOSCO or RESELLER, that the Station is guaranteed to be an environmentally compliant or safe place. RESELLER acknowledges that environmental compliance and safety of the workplace is primarily RESELLER's responsibility and not TOSCO's;



(7)     If permitted by law, upon the request of TOSCO, operate at least one (1) of the fuel islands (or one (1) of the dispensers if the Station has only one (1) fuel island) on a self-serve basis;

(8)     Comply with all laws, ordinances, rules and regulations of constituted public authority governing the use and occupancy of the Station and the conduct of RESELLER's business at the Station; and

(9)     Devote sufficient time to the personal management of the Station so that it is operated consistently in conformance with the requirements of this Agreement.

## 6.    PROHIBITED USES.

(a)     RESELLER shall not use the Station or any part thereof, without TOSCO's prior written consent, for any of the following:

(1)     An automobile, truck or equipment rental business;

(2)     A vehicle towing business consisting or two (2) or more tow trucks;

(3)     A business of selling vehicles of any kind;

(4)     A parking lot; or storage of junk, disabled vehicles or used tires or batteries;

(5)     A business that involves major engine overhauls, auto body repair, welding, or any other operation that involves an open flame; or

(6)     A franchise or franchise business operated on or from the Station other than any franchise or franchise business approved by TOSCO or offered by TOSCO to RESELLER;

(b)     RESELLER shall not, without the prior written consent of TOSCO:

(1)     Obstruct any entrance, exit, pin corner, or pump island or otherwise restrict access to the Station, or any part thereof, or block delivery carrier's access to storage tank fill pipes;

(2)     Store or sell any intoxicating beverage unless RESELLER has secured TOSCO's prior written approval and all necessary permits and licenses and liquor liability insurance, and RESELLER and RESELLER's employees are trained in the proper procedures of selling intoxicating beverages.  Further, no intoxicating beverage shall be consumed by anyone at the Station; and no one shall be permitted to work at the Station while under the influence of an intoxicating beverage;

(3)     Store, sell or consume any illegal drugs, or permit drug paraphernalia to be present or tolerated at the Station; and no one shall be permitted to work at the Station while under the influence of an illegal drug;

(4)     Conduct any illegal, pornographic, sexually explicit, offensive, noisy or dangerous activities, including, but not limited to, the sale or display of any illegal, immoral, pornographic or sexually explicit materials;

(5)     Discharge, or permit the discharge of, petroleum products or other products or materials onto the Station, or adjacent properties;

(6)     Maintain or permit animals to be present or condition to exist which may endanger the health, safety or well being of persons at the Station;



(7)     Restrict the use of the Station facilities by the installation of coin-operated devices in the restrooms, on restroom doors or on air and water dispensers.  Install or operate any pinball or amusement games of any type without the prior written consent of TOSCO;

(8)     Create or permit waste at the Station, or any part thereof, or allow, or condone, any activity on the Station, or any part thereof, that shall constitute a nuisance;

(9)     Permit the Station to be used as housing, sleeping, or living quarters.  Station is to be used for business purposes only; and

(10)     Attach or place anything anywhere which could diminish, interfere with, infringe upon or otherwise dilute the of Union 76 Marks or confuse or deceive the public.

## 7.     FIVE STAR STANDARDS PROGRAM.

(a)     TOSCO has developed and manages a customer service and service station operations quality assurance program, as described in the Five Star Standards Program Manual ("Manual") to be provided by TOSCO to RESELLER from time to time.  The intent of the Five Star Standards Program is to ensure that all TOSCO dealers meet and/or exceed the expectations of their customers.  RESELLER shall employ such personnel and other resources so as to consistently comply with the standards, procedures, policies and restrictions set forth in the Manual.  TOSCO shall have the right, from time to time, to amend, add to or delete any standard, procedure, policy or restriction in the Manual.

(b)     RESELLER acknowledges that providing superior customer service is essential not only to the success of RESELLER's business but also to the reputation and integrity of TOSCO and the Union 76 Marks.  RESELLER therefore agrees that RESELLER shall:

(1)     Develop customer responsiveness programs designed to respond to and resolve customer inquiries or complaints within a maximum of fourteen (14) days from the date any inquiry or complaint was directly received by RESELLER or referred to RESELLER for response from TOSCO;

(2)     Monitor the quality of service and cleanliness at the Station; and

(3)     Participate in TOSCO's Mystery Shopper Program, and promptly take actions to correct or improve any operations at the Station which scores lower than the baseline score, as established and adjusted from time to time by TOSCO.  TOSCO shall not be obligated to provide a continuous Mystery Shopper Program.

## 8.     RIGHT TO OCCUPY STATION.

RESELLER warrants and represents that RESELLER has the right to occupy the Station, either pursuant to a leasehold and/or in fee ownership, for the entire Term of this Agreement.  RESELLER recognizes that TOSCO enters into this Agreement in reliance upon RESELLER's right to occupy the Station.

## 9.     TAXES.

RESELLER shall promptly pay when due all taxes levied or assessed by reason of RESELLER's operation and performance under this Agreement.  RESELLER further agrees to pay State unemployment tax, State sales tax (including any sales or use tax on equipment purchased or leased), and all other taxes and expenses of operating the Station.  In the event of any bona fide dispute as to the liability for taxes assessed against RESELLER, RESELLER may contest the validity or the amount of the tax in accordance with procedures of the taxing authority.  In no event, however, shall RESELLER permit a tax sale or seizure by levy of execution of similar writ or warrant to occur against the Station or any of the inventory, supplies, or equipment located thereon.



**10.     TRADEMARKS.**

         (a)     It is expressly agreed and acknowledges that any Union 76 Marks and all related practices, procedures, methods, devices and techniques used by RESELLER hereunder are the sole and exclusive property of TOSCO, and that nothing in this Agreement grants or shall be construed as granting RESELLER, or any other, any right, ownership, title or interest therein.  RESELLER further acknowledges that all goodwill relating to the Union 76 Marks shall inure to the benefit of TOSCO.

         (b)     TOSCO hereby grants RESELLER a license to use the Union 76 Marks for the purposes and upon the terms and conditions expressly set forth in this Agreement.  RESELLER shall have no right to assign or sublicense said rights, except with TOSCO's prior written consent.  RESELLER shall only use the existing or future Union 76 Marks and related practices, systems, procedures, methods, devices and techniques and variations thereof as are applicable to the Station and which are at all times in conformity with TOSCO's Union 76 service Station formats.

         (c)     At no time during the Term hereof shall RESELLER advertise the Union 76 Marks or use the Union 76 Marks in advertising or any other form of promotion except as may be approved by TOSCO.  At no time during the Term hereof nor after the expiration or termination of this Agreement shall RESELLER advertise or otherwise utilize, at the Station or elsewhere, any marks, trade dress, logotypes, or names confusingly similar to the Union 76 Marks.

         (d)     RESELLER shall not use the Union 76 Marks, nor other TOSCO brand names, nor TOSCO's name in RESELLER's own trade name or corporate name and RESELLER shall not use RESELLER's own trade name or any other corporate name in connection with the Union 76 Marks.

         (e)     RESELLER shall not adulterate, add to, mix, commingle or blend with any of TOSCO's products in connection with which RESELLER uses the Union 76 Marks, any other products, additives, materials or substances.  RESELLER agrees that under no circumstances will the Union 76 Marks or distinctive colors of Union 76 licensed under this Agreement be employed to identify products originating from any source other than TOSCO or other than the particular grade or quality corresponding to the designation employed.  TOSCO shall have the right from time to time to take samples of motor fuels from the Station for testing purposes, at TOSCO's option, to ensure compliance.

         (f)     The Station and the dispensing equipment used for licensed products shall be painted and kept clean and legible in accordance with TOSCO's visual standards.  TOSCO (or TOSCO's designated agent) shall erect appropriate signs and other identification materials indication the Station is a Union 76 branded facility licensed for the sale of Union 76 products, which RESELLER shall keep clean and legible, and shall not modify, alter, obstruct or move in any way, except as previously approved of by TOSCO in writing.  TOSCO's (and or TOSCO's designated agent) shall have the right, but not the obligation, to enter upon the Station from time to time to adjust, exchange, remove or add to TOSCO's signs and other identification materials.  Any advertising materials utilized by RESELLER shall be in conformity with TOSCO's standards for the Union 76 Marks.

         (g)     Upon the expiration, nonrenewal or termination of this Agreement, for any reason, RESELLER shall immediately cease and discontinue the use of said Union 76 Marks, any other TOSCO authorized marks, and/or any marks or names confusingly similar thereto in RESELLER's operation or in advertising and promotions of the Station and or products sold there, and shall return to TOSCO all signs or advertising materials containing such Union 76 Marks and/or marks with thirty (30) days after such expiration or termination occurs.

**11.     MOTOR FUELS BRANDS, GRADES AND QUANTITY.**

         (a)     During the Term of this Agreement, RESELLER shall continuously stock and offer for sale sufficient quantities of each grade and type of Union 76 branded motor fuels, generally offered by TOSCO in the geographic area of RESELLER's Station, as will satisfy consumer purchase requirements



on a prompt basis. TOSCO shall have the right to change or discontinue, from time to time, such brands or grades of motor fuels without RESELLER's permission.

(b)     RESELLER shall purchase the quantities of motor fuels set forth herein in the <u>Quarterly/ Annual Minimum Volume Schedule</u> attached hereto as **Exhibit D** ("Contract Volumes") from TOSCO. RESELLER's failure to purchase at least eighty percent (80%) of the motor fuels requirements set forth in **Exhibit D** ("Minimum Volume") from TOSCO shall, subject to RESELLER's right to cure as set forth hereinafter, be cause for termination and/or nonrenewal of this Agreement by TOSCO. The requirement of RESELLER to purchase Minimum Volume is a provision of this Agreement that is both reasonable and of material significance to the franchise relationship. Quarterly written volume summaries shall be furnished by TOSCO to RESELLER. In the event RESELLER has failed to meet Minimum Volume for a quarterly period of this Agreement, RESELLER shall be afforded the opportunity to cure by taking delivery of the unpurchased volume from the prior quarterly period plus the Minimum Volume over the six (6) month period following the quarterly period in which RESELLER failed to purchase the Minimum Volume ("Cure Period"). In determining whether volume has been deficient for a given quarterly period, volumes purchased in excess of the minimum quarterly volume(s) for the preceding two (2) quarterly periods, if any, shall be credited to the volume for the deficient quarterly period. Failure to purchase Minimum Volume and to effect cure during the Cure Period is the occurrence of an event which is relevant to the franchise relationship and as a result of which termination or nonrenewal of the franchise relationship is reasonable.

(c)     TOSCO recognizes that there may occur extenuating and uncontrollable circumstances affecting the Station such as, but not limited to, road construction, natural disasters, supply shortages or abnormal market conditions, that may affect a Station from selling its Contract Volume. In such cases, RESELLER may make a written request for a reasonable temporary adjustment to the Contract Volumes set forth in **Exhibit D** stating specifically the reason the adjustment is being requested. TOSCO agrees to respond to all volume adjustment requests within twenty-one (21) days of receipt.

(d)     To facilitate deliveries to the Station, at TOSCO's written request, RESELLER agrees to order products by such method as TOSCO reasonably determines, in TOSCO's sole discretion, will best achieve compliance with the requirements set forth in this Section including, but not limited to, TOSCO's Automatic Replenishment Program ("ARP"). In the event TOSCO elects to receive orders or stage deliveries of motor fuel products to the Station via TOSCO's ARP, RESELLER hereby agrees to comply with the following procedure:

(1)     On each day of Station operations including, but not limited to, Saturdays, Sundays and holidays, RESELLER shall via a telephonic transmission procedure prescribed by TOSCO, enter into TOSCO's ARP the following data:

(i)     The quantity in gallons of the prior days sales of each grade of motor fuel offered for sale at the Station; and

(ii)     The quantity in gallons of the ending inventory for the prior day of each grade of motor fuel stored in the underground storage tanks at the Station.

(2)     In the event the ARP is inoperable for any reason, upon timely notice from TOSCO that all orders shall be placed to TOSCO's Order Desk, RESELLER shall place orders to such TOSCO Order Desk personnel as TOSCO may direct or to TOSCO's Interactive Voice Response Ordering System.

(3)     RESELLER shall accept delivery at such time, by such method of delivery, and in such minimum quantities per single delivery, as TOSCO shall elect. RESELLER hereby grants TOSCO twenty-four (24) hour per day access to RESELLER's motor fuel storage tanks at the Station for purposes of motor fuel delivery.



(4)   In all instances, TOSCO reserves the right to charge RESELLER a demurrage or administrative charge(s) in such amounts as are reasonable and customary, in the event TOSCO determines in good faith that RESELLER or any of its employees, contractors or representatives are responsible for delaying the delivery of TOSCO's motor fuel to the Station including, but not limited to, a determination that the quantity of motor fuel products staged for delivery to the Station could not or should not in fact have been delivered because RESELLER failed to comply with, or erroneously reported the data to, the ARP.

**12.   DELIVERY.**
(a)   Deliveries of TOSCO motor fuel shall be made at times determined by TOSCO upon RESELLER's order of full truck and trailer quantities in single deliveries subject to TOSCO's equipment and product availability.  TOSCO shall make all reasonable efforts to deliver motor fuels to the Station within twenty-four (24) hours of RESELLER's order, 365 days per year; however, TOSCO shall not be required to make deliveries within forty-eight (48) hours following receipt of RESELLER order or outside of business hours or on Sunday or holidays.

(b)   TOSCO will fill all orders with reasonable promptness, but shall not be liable for loss or damage due to delays or failure in whole or in part to fill orders resulting from RESELLER's banking arrangements, ability for TOSCO to confirm RESELLER's funds, acts of God, acts of publics enemies, laws, regulations, orders, requests, recommendations or rules of civil or military authorities, fires, floods, storms, strikes, labor disputes, accidents, equipment failure, shortage of labor, of crude oil, of refined products or refinery capacity, of materials, or of transportation, or any other cause beyond TOSCO's reasonable control, either at its own plants or those of its sources of supply, or in connection with the delivery of its products.  If because of any of the foregoing causes or other actual or threatened disruption in supply, TOSCO is prevented or deems it necessary to not supply the full quantities of any one or more of its products hereunder, TOSCO shall have the right without liability to RESELLER to allocate the quantity deliverable hereunder to RESELLER, to its other customers for like products, and to its own requirements in such manner as TOSCO may deem reasonable, or according to any required allocation program, and RESELLER shall be bound by such allocation.  In no event shall TOSCO be liable for loss of profits or special or consequential damages because of delay or failure to make deliveries.

(c)   If RESELLER requests delivery of less than TOSCO's established minimum volumes, compensatory delivery charges will be imposed.  If, at that time this Agreement is entered into, the Station is equipped for the handling of only two (2) grades of gasoline, RESELLER acknowledges and agrees that TOSCO has no obligation to supply three (3) grades of gasoline to the Station.  In no circumstances is TOSCO obligated to make deliveries into a tank which is or is suspected of leaking.

**13.   TITLE TO MOTOR FUEL AND STOCK LOSSES.**
(a)   Title to and risk of loss of TOSCO motor fuel delivered by TOSCO to RESELLER under this Agreement passes to RESELLER at the time the motor fuel enters the motor fuel storage tanks at the Station.

(b)   RESELLER shall make a good faith effort to advise TOSCO of any claim of which RESELLER becomes aware as to quality of TOSCO motor fuel delivered under this Agreement in writing within five (5) days after discovery thereof.

(c)   RESELLER shall make a good faith effort to advise TOSCO of any claim of which RESELLER becomes aware as to quantity of TOSCO motor fuel delivered under this Agreement in writing within ten (10) days after delivery.



**14.    ALLOCATION.**

If at any time the volume of TOSCO motor fuel TOSCO has available for sale and delivery to its customers is, for any reason not within TOSCO's reasonable control, less than the volume needed to supply its customer demands, TOSCO shall allocate the volume of available TOSCO motor fuel to itself and its customers under a plan and formula that TOSCO determines is fair and reasonable as applied to all customers of TOSCO who have a demand for such products.

**15.    PURCHASE PRICE.**

The purchase price to be paid by RESELLER for the brands and grades of TOSCO's motor fuel sold and delivered to the Station shall be the price in effect for the Station at the time TOSCO loads the branded motor fuel at its bulk plant or terminal for delivery to the Station.

**16.    TERMS OF PAYMENT AND CREDIT REQUIREMENTS.**

(a)    RESELLER shall pay for TOSCO's motor fuel, and all other goods and services, purchased from TOSCO according to the terms and conditions established from time to time by TOSCO's Credit Department.  TOSCO's Credit Department, for the purpose of evaluating RESELLER's financial status for credit granting purposes, will require from time to time RESELLER to provide TOSCO with financial information.  RESELLER's failure to respond to any such request may result in TOSCO's withdrawal or denial of credit privileges to RESELLER.  If RESELLER fails to fulfill the terms of payment, fails to provide financial information and/or if RESELLER's financial capabilities or creditworthiness shall, in TOSCO's sole judgment, deteriorate, TOSCO may, without prejudice to any other lawful remedies:

  (1)    Defer shipments of product until payment is made in full;

  (2)    Demand payment and/or cash in advance;

  (3)    Demand additional security and/or financial guaranties;

  (4)    Withdraw entirely all, and/or partially, credit privileges; and/or

  (5)    Nonrenew or terminate this Agreement.

(b)    RESELLER may be required to maintain a security deposit as is reasonably determined by TOSCO's Credit Department from time to time.  RESELLER shall deposit required security into RESELLER's reserve account with TOSCO promptly upon request by TOSCO.  In the event RESELLER has any outstanding amounts due on RESELLER's account and/or any ancillary agreements including, but not limited to, promissory notes, amortization agreements, equipment leasing or facility modification agreements, TOSCO shall have the option to apply available credit and/or security deposits to offset RESELLER debt.

(c)    No payment made to TOSCO by check or by any other instrument shall contain a restrictive endorsement of any kind.  A restrictive endorsement shall have no legal effect even if the instrument restrictively endorsed is processed for payment and TOSCO retains the proceeds.

(d)    RESELLER agrees to establish an account with a financial institution that provides electronic funds transfer ("EFT") services and to authorize certain transfers of funds between that account and designated account(s) of TOSCO under terms and conditions that may be established by TOSCO from time to time.  RESELLER shall provide TOSCO with the information and authorization necessary to debit and credit RESELLER's account through EFT transactions.  The type of RESELLER debiting transactions from which EFT's may be used include, but are not limited to, payment for rent, amortization agreements if any, promissory notes if any, motor fuel deliveries, other product purchases, credit card chargebacks, RESELLER repairs made by TOSCO and other monies owed by RESELLER to TOSCO.  The types of RESELLER credit transactions which may be made through EFT's include, but



are not limited to, TOSCO purchases of credit card invoices, rebates or other price adjustments for which RESELLER may qualify.  TOSCO reserves the right to require RESELLER to make or receive payments for other additional types of transactions.  RESELLER agrees to provide the necessary authorization and assistance to implement such additional EFT's promptly upon the request by TOSCO.

## 17.   CREDIT CARD SALES.

TOSCO has a Union 76 retail credit card system available for use by the public.  RESELLER may make sales of Union 76 motor fuel or other products and service at the Station as authorized in TOSCO's Service Station Credit Card Guide ("Guide'") to persons presenting a valid Union 76 credit card or a credit card issued by a company listed in  the Guide.  If RESELLER elects to make credit card sales to customers presenting an acceptable credit card, RESELLER shall comply with the instructions, policies and restrictions set forth in the Guide and agrees that TOSCO may refuse to accept credit card invoices, or may charge back to RESELLER any credit card invoices, where RESELLER has failed to comply with any instruction, policy or restriction set forth in the Guide.  TOSCO shall have the right, from time to time, to amend, add or delete any instruction, policy or restriction in the Guide including the right to charge a fee for TOSCO's acceptance of credit card invoices evidencing purchases from RESELLER. If RESELLER is past due on any payment to TOSCO, TOSCO may, without limiting any other lawful remedy, first apply credit card invoices to the payment of the past due indebtedness.

## 18.   SIGNS.

(a)     Subject to applicable laws, ordinances, and regulations, and subject to TOSCO's prior written approval as to format, location, size, and color scheme, RESELLER may install advertising materials only for the products, services and promotions available at the Station.

(b)     Further, RESELLER agrees that the dispenser posted price of each grade of gasoline, and if applicable, diesel fuel, offered for sale from  the Station shall be displayed at all times on appropriately illuminated signs at or near the street(s) fronting the Station, and that the size and color of price sign letters and numerals shall comply with TOSCO's image requirements and any and all State and Federal requirements.  In no instance shall RESELLER remove said signs, letters, or numerals without TOSCO's prior written approval.

## 19.   NO EXCLUSIVE AREA.

RESELLER and TOSCO hereby agree that nothing herein, shall be construed as giving RESELLER an exclusive right to sell in any area.  TOSCO reserves the right to sell its motor fuel, tires, batteries, accessories, lubricating oils, whether branded or unbranded, or any other product anywhere, by any means, and in any area, including in the area or market in which the Station is located.

## 20.   MAINTENANCE AND REPAIRS.

RESELLER shall keep the Station clean and well maintained.  RESELLER understands that continuous maintenance does more than just convey an image of cleanliness, and a high level of professionalism, it invites customers to stop by the Station and buy products. RESELLER acknowledges and accepts the responsibility to maintain all equipment, including TOSCO Equipment, located at the Station, at RESELLER's sole expense, clean, maintained, in good repair, and replaced if needed. Equipment shall be in compliance with applicable laws and meet the image standards of TOSCO.

## 21.   TELECOMMUNICATIONS.

TOSCO reserves the right, from time to time, to require RESELLER to obtain telecommunications equipment for the processing and transfer of business data between TOSCO and RESELLER.  Data received or transmitted over such equipment may include, but is not limited to, the following: pricing information, credit card processing information, fuel delivery scheduling information, and other information deemed by TOSCO to be necessary for the facilitation of the business set forth in this Agreement. Telecommunication equipment includes, but is not limited to, the following: electronic facsimile machines, personal computers equipped with telephone modems, satellite transmission and receiving equipment and



Card Reader In Dispenser (CRIND) equipment. RESELLER agrees to obtain said equipment at RESELLER's sole expense, as well as pay any monthly fees for equipment or services, unless otherwise specified by TOSCO. TOSCO agrees to provide RESELLER at least sixty (60) days prior written notice of any equipment or service requirement relating to this Section.

## 22.   COMPLIANCE WITH LAWS.

RESELLER has and will fully comply with any and all Federal, State and local laws including, but not limited to, ordinances, orders, rules, taxing requirements and regulations and all laws including, but not limited to, those laws relating to equal opportunity, affirmative action, clean air and water, environmental law, toxic or hazardous materials, occupational health and safety. RESELLER shall obtain all permits, licenses and approvals necessary for the performance of this Agreement. RESELLER does hereby warrant that no law, rule or ordinance of the United States, any state or any other government authority or agency has been violated in the performance of this Agreement. Failure to comply with any laws will be a material breach of this Agreement.

## 23.   ENVIRONMENTAL COMPLIANCE.

(a)   RESELLER agrees to become informed about, comply and cooperate with and abide by all local, State and Federal laws, statutes, regulations and ordinances related to environmental protection, compliance or regulations and ordinances related to environmental protection, compliance or requirements related thereto, whether currently in effect or which may come into effect in the future including, but not limited to:

(1)   The Resource Conservation and Recovery Act, as amended, 42 USC 6901, et seq., the Clean Water Act, as amended, 33 USC 1251, et seq., the Clean Air Act, as amended, 42 USC 7401, et seq., and the Safe Drinking Water Act, as amended, 42 USC 300 f, et seq.;

(2)   The generation, handling, transportation, treatment, storage and/or disposal of solid or hazardous wastes. RESELLER agrees to implement appropriate recycling, waste management and waste minimization practices and procedures;

(3)   The Environmental Protection Act with special attention to the regulations governing the storage, dispensing and sale of unleaded gasoline;

(4)   All laws and ordinances related to the environment and with the rules, orders and regulations issued and promulgated thereunder, RESELLER shall procure and maintain all permits and licenses required thereunder; and

(5)   The underground storage tank ("UST") system compliance requirements, whether currently in effect or which may come into effect in the future.

## 24.   RECORD KEEPING AND AUDITS.

(a)   RESELLER shall maintain permanent and complete records of all sales of motor fuels as required by law and/or this Agreement. The records shall include sales slips, sales checks, other original sales records and a daily motor fuel inventory that shall include motor fuel deliveries received, motor fuel sales, including daily dispenser meter readings for all motor fuel products, which will support daily inventory reconciliation(s) made at the Station. If requested by TOSCO, RESELLER shall provide sales records, verified before a notary public.

(b)   TOSCO, or their authorized representative, shall have the right to audit RESELLER's books, records, reports, or any and all other records to determine RESELLER's compliance with this Agreement. The purpose of such an audit by TOSCO shall include, but is not limited to: (1) Determining the gallons of motor fuel sold under the Union 76 Mark; (2) Environmental compliance; (3) Verification of



credit card receipts; and/or (4) Review of RESELLER's inventory reconciliation(s) records. If requested by TOSCO, RESELLER shall provide a statement of said records verified before a notary public.

**25.   INDEMNIFICATION.**
(a)      RESELLER shall protect, defend with counsel selected by TOSCO, release, indemnify and hold free and harmless TOSCO, its affiliates, employees, directors, officers, from and against any and all claims, liabilities, losses, liens, demands, lawsuits and causes of action of every kind and character (claims) including without limitation the amount of judgments, fines, penalties, interest, court costs and legal fees incurred by TOSCO, its affiliates, agents and employees in defense of same arising in favor of any party, including without limitation, governmental or quasi-governmental agencies or bodies, on account of claims, liens, debts, personal injuries, death, or damages to property (including property of TOSCO, its affiliates, agents and employees) and without limitation by enumeration, all other claims of every character occurring or in any way incident to, in connection with, or arising out of the conduct of RESELLER's business.   RESELLER shall also investigate, handle, respond to, provide defense for and defend any such claim, at RESELLER's sole expense, and shall bear all other costs and expenses related thereto, even if same is groundless, false or fraudulent.

(b)      RESELLER acknowledges and agrees to provide TOSCO written assurance within ten (10) days from TOSCO's request for RESELLER to accept tender of a claim and to notify and instruct RESELLER's insurance carriers that TOSCO is an indemnified party.

**26.   INSURANCE.**
(a)      Without limiting RESELLER's obligations to indemnify TOSCO fully as set forth under the Indemnification Section above, RESELLER agrees to purchase and maintain at all times during the Term hereof insurance acceptable to TOSCO which is primary as to any other existing valid and collectible insurance and shall specifically name **Tosco Corporation, a Nevada corporation, its subsidiaries, affiliates and assigns**, as Additional Insureds with a Cross Liability Clause (Severability of Interest).  Such insurance shall include the following minimum types and limits:

(1)      (i)  Workers' Compensation Insurance as required by law; and (ii) Employers' Liability Insurance with a minimum limit of $500,000 each occurrence or an amount which satisfies statutory requirements (whichever is greater);

(2)      Commercial General Liability Insurance, or Garage Liability Insurance, or the equivalent, covering all Station operations, RESELLER business, premises operations and products liability, and contractual liability, in an amount of at least $1,000,000 combined single limit for bodily injury and property damage per occurrence, $2,000,000 aggregate;

(3)      Comprehensive Automobile Liability Insurance covering all hired, owned or otherwise operated non-owned, vehicles with a minimum combined single limit of $1,000,000 for bodily injury and property damage, including personal injury, per occurrence;

(4)      Garagekeepers Legal Liability Insurance, if applicable, covering customer's vehicles in RESELLER's care, custody and control, including coverage for loss by fire, explosion, theft, vandalism, and/or malicious mischief and collision or upset with a minimum limit of $50,000 each occurrence;

(5)      Liquor Liability Insurance covering RESELLER's business operation for loss or damages with a minimum limit of $1,000,000 per occurrence; and

(6)      To the extent reasonably available and commercially affordable, Environmental Pollution Liability Insurance and/or Environmental Impairment Liability Insurance which specifically covers, but is not limited to, leaks occurring from underground tanks and piping system, whether they are sudden or gradual, with coverage extending to any and all expenses of clean-up or recovery,



including excavation of contaminated soil, in an amount not less than $500,000 combined single limit of liability.

(b)     Upon the full execution of this Agreement and from time to time thereafter upon the request of TOSCO, RESELLER shall provide TOSCO with a certificate or certificates of insurance evidencing RESELLER's procurement of all the foregoing insurance coverage and that all such insurance is binding and in full force and effect.

(c)     The insurance polices required by this Insurance Section shall be written by companies satisfactory to TOSCO.  RESELLER's insurance coverage and policies shall state that TOSCO will receive at least thirty (30) days prior written notice of any cancellation or change.  With regards to Workers' Compensation and Employer's Liability Insurance, subrogation shall be waived against TOSCO.

(d)     RESELLER agrees to increase the amounts of any insurance described herein promptly upon receiving the written notice from TOSCO to do so.

(e)     The insurance required hereunder in no way limits or restricts RESELLER's obligation as to indemnification of TOSCO and others and, further, the insurance to be carried shall be in no way limited by any limitation placed upon the Indemnification Section given as a matter of law.  RESELLER shall immediately notify its insurance carrier, with a copy to TOSCO, of all claims, liabilities, losses, liens, demands, or lawsuits and any other matters covered by any RESELLER's insurance.  Any deductible amounts are RESELLER's responsibility.

## 27.   TRANSFERS, SUBLETTING AND SALES.

(a)     RESELLER may not sell, assign, or transfer this Agreement or any rights hereunder, in whole or in part, without TOSCO's prior written consent.  This Agreement may not be assigned by operation of law.  Any attempt by RESELLER to assign this Agreement or any rights hereunder without TOSCO's prior written consent shall be void and of no force and effect.

(b)     The foregoing notwithstanding, provided RESELLER shall be in full compliance with all the terms and provisions of this Agreement, RESELLER may transfer this Agreement and RESELLER's rights hereunder to a corporation in which the RESELLER owns beneficially and of record, and shall continue to own, beneficially and of record throughout the term of this Agreement more than fifty percent (50%) of the capital stock and voting power of such a corporation.  Prior to such acquisition, an appropriate resolution shall be duly adopted by such corporation acknowledging the foregoing requirement of ownership and regulating the issuance, assignment, transfer, sale or other disposition of the corporation's capital stock accordingly, and the contents of such resolution shall be reflected in the corporation's records and noted conspicuously on all stock certificates issued by the corporation. At least thirty (30) days prior to such transfer, TOSCO shall be notified immediately following said resolution in writing of same.  Upon any such transfer, and from time to time thereafter, RESELLER shall execute such instruments, including personal or corporate guarantees of the obligations of the corporation to which this Agreement and the rights hereunder have been transferred, as may be requested by TOSCO in TOSCO's sole judgment.

(c)     Upon the death or incapacity of RESELLER, if RESELLER is not incorporated, the rights granted under this Agreement may be transferable as provided by State or Federal law, or, if no valid State or Federal law shall be applicable, to the adult child or legal spouse of RESELLER, provided arrangements have been made satisfactory to TOSCO for the continued active and competent management of the Station in compliance with all of the terms of this Agreement, including without limitation the qualification of said adult child or spouse as a TOSCO reseller.  Upon the death or incapacity of the controlling stockholder or stockholders, if RESELLER is incorporated, this Agreement will continue in effect, provided the active management of the Station continues in a manner which fully and completely complies with all of the terms of this Agreement.



(d)     Subject to such limitations or prohibitions imposed by the Petroleum Marketing Practices Act, 15 U.S.C. Section 2801, et seq. ("PMPA") or by State statute where PMPA does not pre-empt, this Agreement is personal to RESELLER and RESELLER will not without the prior written consent of TOSCO: (1) assign, mortgage, encumber, or otherwise transfer this Agreement or the interest hereby created; (2) permit any lien or encumbrance to be place on the Equipment, (3) become associated with any other person as a partner or otherwise with respect to this Agreement, or (4) permit any other person, firm or corporation to occupy the Station or any part thereof; except as may otherwise be required by law.  If RESELLER seeks TOSCO's consent for any of the foregoing RESELLER shall contemporaneously provide TOSCO with all pertinent documentation relating thereto.

(e)     If not prohibited by applicable law, if RESELLER receives an offer to assign or otherwise transfer this Agreement, the RESELLER's interest hereunder, or to convey, transfer, assign or alienate RESELLER's interests in the Station or RESELLER's interest hereunder which offer RESELLER desires to accept, RESELLER shall notify TOSCO in writing of all terms and conditions of such offer, and TOSCO shall have a right of first refusal and the option to acquire RESELLER's interest on such terms and conditions.  If TOSCO desires to exercise its right of first refusal, RESELLER's right to assign or otherwise transfer shall be subject to the provisions of hereof.  In the event RESELLER sells, transfers or assigns RESELLER's interest in the Agreement to a corporation in which RESELLER has controlling interest and RESELLER offers in writing to personally guarantee the corporation's performance of RESELLER's obligations under this Agreement, TOSCO's rights of first refusal under this shall not apply.

## 28.    **TERMINATION BY TOSCO.**

(a)     This Agreement is subject to and governed by Title I of the Petroleum Marketing Practices Act, 15 USC 2801, et seq. ("PMPA) To the extent any provision of this Agreement conflicts with the PMPA, that provision shall be deemed modified so as to comply with the PMPA.  Notice of termination or nonrenewal of this Agreement by TOSCO shall be provided in the manner prescribed by the PMPA and the franchise created by this Agreement shall continue until the effective date, including any postponement thereof, of such termination or nonrenewal.  A copy of the PMPA is attached to this Agreement as **Exhibit E**.

(b)     In addition to any other rights of termination which TOSCO may have, upon the occurrence of any of the following events, or such other grounds as are set forth in the PMPA, TOSCO shall have certain rights to terminate or nonrenew this Agreement.  RESELLER and TOSCO agree that the following events, by way of example, but not limitation are reasonable and of material significance to the franchise relationship and are lawful grounds for termination of this Agreement:

(1)     Default in the payment of any installment of rent or any other sum due TOSCO from RESELLER when due;

(2)     RESELLER's failure to comply with any of the maintenance responsibilities and standards as set forth in this Agreement;

(3)     RESELLER's failure to comply with any applicable law, ordinance, regulation, judicial or administrative order, or other legal requirement of any governmental authorities pertaining to this Agreement and/or RESELLER's operation of the Station products;

(4)     RESELLER's attempts to sell, assign, give, grant, devise, or otherwise dispose of RESELLER's interest in this Agreement or the Station without the prior written consent of TOSCO;

(5)     RESELLER's unauthorized loading, unloading, storage, transportation, and/or sale of petroleum products;



(6)     RESELLER's making or furnishing of any false or misleading statement, or failure to disclose information to TOSCO, its agents or employees, concerning any material fact for the purpose of inducing TOSCO to make any payment, deliver product, extend or continue to extend credit, or issue any credit memorandum to RESELLER or any other party acting in cooperation with RESELLER;

(7)     Any attachment, garnishment, execution or other legal process or proceeding is levied or brought, by anyone other than TOSCO, against or involving the Agreement or the Station, or if any other financial impairment exists as to the Station, and such is not removed, cured, bonded, or satisfied within forty-five (45) days from such date of levy, execution, or other commencement of proceedings;

(8)     The Station is vacant, unattended or not operated for the retail sale of motor fuels for seven (7) consecutive days or such lesser period of time which under the facts and circumstances constitutes an unreasonable period of time; and

(9)     RESELLER's failure to comply with the use, operation and image standards and trademark requirements as set forth herein.

(c)     Nonrenewal or termination of this Agreement under this Section or any other Section shall not discharge RESELLER from any liability of RESELLER to TOSCO occurring or accruing up to the effective date of any such nonrenewal or termination including, but not limited to, outstanding debt, insurance coverage and indemnity.

## 29.   TERMINATION BY RESELLER / TOSCO'S PURCHASE OPTION.

(a)     TOSCO is hereby granted by RESELLER for itself, its successors and assigns, the right and option of purchasing all of RESELLER's right, title and interest in the Station ("Purchase Option"), during the Term of this Agreement upon the occurrence of any one (1) of the following events:

(1)     RESELLER, or its successors, assigns, heirs, devisees, administrators, executives or personal representatives shall sale, transfer, assign or terminate this Agreement; or

(2)     RESELLER fails to purchase the Minimum Volumes as set forth in **Exhibit D** at the Station.

(b)     RESELLER shall give TOSCO sixty (60) days prior written notice of the occurrence of such event and TOSCO shall have the right to exercise its Purchase Option.  Failure to exercise the Purchase Option within the sixty (60) days, from the date TOSCO receives notice, shall constitute a waiver by TOSCO of its right to exercise its Purchase Option with respect to the circumstances in issue at the time, but shall not constitute a waiver of TOSCO's Purchase Option as to any or all future events.

(c)     In the event TOSCO elects to exercise its Purchase Option, the purchase price to be paid by TOSCO shall be the fair market value of the Station at the time of TOSCO's exercise of the Purchase Option.  If RESELLER and TOSCO are unable to mutually agree as to the fair market value within thirty (30) days of TOSCO's exercise of the Purchase Option, the fair market value shall be determined by three MAI certified commercial real estate appraisers with no less that five (5) years experience in the area in which the Station is located ("appraiser"). Within ten (10) days of the conclusion of the thirty (30) day negotiation period, TOSCO shall appoint the first appraiser, at TOSCO's sole cost and expense, and RESELLER shall appoint the second appraiser, at RESELLER's sole cost and expense.  Within the next twenty (20) days the two appraisers shall appoint a third appraiser and the costs and expenses of the third appraiser shall be equally divided between RESELLER and TOSCO.  Within the next sixty (60) days, the three appraisers shall in good faith determine the fair market value of the Station, the decision of any two such appraisers being binding upon the third.  The appraisers shall send to RESELLER and TOSCO a written statement of the value of the Station and within sixty (60) days of TOSCO's receipt of same, TOSCO may rescind its exercise of its Purchase Option upon written notice to RESELLER.



(d)     If the Purchase Option shall be exercised in accordance herewith (and not rescinded pursuant to subsection (c) immediately above), the parties shall proceed to close and closing shall occur no later than thirty (30) days from the date of determination of the purchase price.  The whole of the purchase price less any expenses to be paid by RESELLER shall be paid in cash or immediately available funds at closing.  RESELLER shall deliver by warranty deed to TOSCO good and marketable title at closing.  RESELLER shall bear the premium costs for issuance of an ALTA Owner's standard policy of title insurance.  Each party shall bear one-half of the escrow fee and recordation costs.  All taxes, rents, and utilities will be prorated as of the closing date.

(e)     TOSCO and RESELLER shall execute and record a Memorandum of Purchase Option to provide record notice of the rights arising under this Section and a Memorandum of Right of First Refusal to provide record notice of the rights arising hereunder.

## 30.   LIQUIDATED DAMAGES.

(a)     The parties agree and acknowledge that TOSCO has expended significant efforts and expense in securing the rights to use the Union 76 Marks that are licensed to RESELLER under this Agreement, and TOSCO will further expend significant efforts and expense to produce and deliver or otherwise secure a supply of branded motor fuels for resale by RESELLER under said Marks. RESELLER further acknowledges that the Marks licensed to RESELLER have unique value and impart goodwill value to the business of RESELLER.  RESELLER agrees and acknowledges that TOSCO will be harmed by loss of sales to RESELLER in the event RESELLER does not purchase the contractually required Minimum Volumes set forth in this Agreement, or otherwise terminates this Agreement before the end of the Term hereof, or TOSCO must suspend deliveries to the RESELLER because of RESELLER's breach in proportions /amounts that neither TOSCO or RESELLER are able to reasonably determine.  Therefore, in the event RESELLER fails or refuses to perform hereunder, and thereby this Agreement is terminated prior to the expiration of the stated Term (excepting termination by the RESELLER based upon the breach or default by TOSCO and TOSCO's failure to cure such breach or default), or RESELLER is otherwise in breach hereof as a result of which TOSCO suspends deliveries of motor fuel, RESELLER agrees that TOSCO shall be entitled to liquidated damages as stipulated below. These liquidated damages for RESELLER's failure to purchase the required Minimum Volumes under this Agreement, are in addition to any other damages or equitable relief available to TOSCO, for breach of RESELLER's obligations under this Agreement, and shall not bar TOSCO from seeking damages under any other agreements with RESELLER including, but not limited to, promissory notes or amortization agreements.  The parties agree that the damages stipulated below are a reasonable estimation of the amount of such damages as of the date of this Agreement and are not a penalty.

(1)     Liquidated damages payable to TOSCO under this Section shall be an amount calculated by multiplying REDACTED times the minimum monthly gallons TOSCO reasonably expects to be purchased by RESELLER as specified in this Agreement, times the number of months remaining in the Term of this Agreement, including any fraction of a month, commencing as of the time of the breach, refusal to perform, or termination whichever is earlier.  This amount of liquidated damages is due and payable as of the date of said breach, termination, or failure to perform whichever date is earlier.

## 31.   INDEPENDENT CONTRACTOR.

RESELLER is, and shall remain at all times, an independent contractor hereunder.  It is agreed that none of the provisions of this Agreement reserves, or shall be construed as reserving to TOSCO any right to exercise control over the business or operations of RESELLER upon the Station or to direct, in any respect, the manner in which such business and operations shall be conducted (including the price at which products and merchandise are to be sold), it being understood and agreed that the entire control and direction of such activities shall be and at all times remain with RESELLER.  RESELLER shall have no authority to employ any persons as employees, or agents, for or on behalf of TOSCO for any purpose, and neither RESELLER, nor any other persons performing any duties or engaging in any



work at the request of RESELLER shall be deemed to be the employees or agents of TOSCO. RESELLER shall not erect or permit any sign, insignia, or other advertising device, upon or near the Station which would in any way indicate or imply that TOSCO is the owner or operator of the Station.

**32.   NOTICE.**
   (a)   Any demands, requests or notices required or permitted to be given hereunder to RESELLER shall be deemed properly given and served when deposited, postage prepaid, certified, in the United States mail, addressed to RESELLER at the Station or, in lieu of such mailing, personally served upon RESELLER.

   (b)   Any notices hereunder required or permitted to be given under this Agreement to TOSCO by RESELLER shall be deemed properly given and served when deposited, postage prepaid, Certified, in the United States mail, addressed to TOSCO: **Tosco Corporation, P.O. Box 52085, Phoenix, Arizona 85072-2085 Attn: Contract Administration Department (DC75).**

**33.   FORCE MAJUERE.**
   The obligation of the parties to deliver and receive TOSCO motor fuel under this Agreement shall be suspended and excused if TOSCO is prevented from or delayed in producing, manufacturing, transporting or delivering in its normal manner, TOSCO motor fuel or the materials from which TOSCO motor fuel is manufactured, or RESELLER is prevented from receiving or selling TOSCO motor fuel at the Station, because of Acts of God, earthquake, fire, flood, or the elements, malicious mischief, riots, strikes, lockouts, boycotts, picketing, labor disputes or disturbances, war, compliance with any directive, order or regulation or any governmental authority or representative thereof acting under claim or color of authority; loss or shortage of any TOSCO motor fuel or of any part of TOSCO's own or customary transportation or delivery facilities, or for any reason beyond TOSCO's or RESELLER's reasonable control, whether or not similar to the foregoing. Whenever such causes in TOSCO judgment require restriction of deliveries, TOSCO reserves the right in its discretion to restrict deliveries without liability, whether or not delivering to others.

**34.   REVIEW OF AGREEMENT.**
   RESELLER acknowledges that RESELLER has received a copy of this Agreement and all of its exhibits and addendums which were given to RESELLER at least ten (10) business days prior to the date RESELLER signed this Agreement.

**35.   SECTION TITLES.**
   The section titles contained in this Agreement are for convenience only and shall be without substantive meaning or content of any kind whatsoever.

**36.   WAIVER.**
   Waiver by TOSCO or RESELLER of a default or breach of any provision, obligation, term or condition under this Agreement shall not be construed as a continuing waiver, or as a waiver of default or breach of any other provision, obligation, term or condition or of any subsequent default or breach of the same provision, obligation, term or condition.

**37.   WARRANTY AND REPRESENTATION.**
   (a)   RESELLER ACKNOWLEDGES THAT RESELLER HAS ENTERED INTO THIS AGREEMENT AFTER MAKING AN INDEPENDENT INVESTIGATION OF THE UNION 76 SERVICE STATION SYSTEM AND OPERATIONS AND NOT UPON ANY REPRESENTATION AS TO PROFITS OR EARNINGS WHICH RESELLER IN PARTICULAR MIGHT BE EXPECTED TO REALIZE, NOR HAS ANYONE MADE ANY OTHER REPRESENTATION WHICH IS NOT EXPRESSLY SET FORTH HEREIN TO INDUCE RESELLER TO ACCEPT THE FRANCHISE GRANTED HEREIN AND EXECUTE THIS AGREEMENT.



(b)     TOSCO warrants the title to all products sold hereunder and that such products met the description herein.  NO OTHER WARRANTIES EXPRESSED OR IMPLIED ARE MADE BY TOSCO, INCLUDING, BUT NOT LIMITED TO, FITNESS FOR A PARTICULAR PURPOSE; SUCH WARRANTIES ARE EXPRESSLY EXCLUDED FROM THIS AGREEMENT.

### 38.    CONFIDENTIALITY.

RESELLER acknowledges that the systems, methods, procedures and information provided by TOSCO to its resellers are the confidential and are the valuable property of TOSCO, and therefore, RESELLER shall keep such information in a secure and confidential manner and shall not disclose it to third parties or use it, or allow others to use it, other than for the purposes of and as authorized by this Agreement. RESELLER shall only disclose such information to RESELLER's employees, accountants, attorneys and business counselors on a "need to know" basis, such information for the purposes of fulfilling their job responsibilities, and only if they undertake to keep such information confidential.  RESELLER shall ensure that individuals disclosed confidential information are informed of and requested to observe RESELLER's confidentiality obligation under this Agreement.

### 39.    SEVERABILITY.

Should any of the provisions contained in this Agreement be now, or hereafter become, illegal or unenforceable by State or Federal laws or otherwise, such  provisions shall be void during the period of conflict, and the remaining provisions shall continue to be of full force and effect.  If subsequent to the Contract Date of this Agreement valid State or Federal laws or regulations governing the relationship between RESELLER and TOSCO take effect, this Agreement shall be considered to incorporate any mandatory requirements of such laws or regulations so long as they shall be effective, and any provisions of this Agreement in conflict therewith shall during such period be void.

### 40.    SECURITY INTEREST.

(a)     In order to secure payment of all RESELLER's present and future indebtedness owed by RESELLER to TOSCO at any time during the Term of this Agreement or upon its termination or expiration, RESELLER hereby grants to TOSCO a security interest and/or a purchase money security interest in:

(1)     All of RESELLER's inventory of petroleum products and other products purchased from TOSCO, regardless of when purchased;

(2)     All chattel paper, general intangibles and accounts receivable owing to RESELLER regardless of when or how incurred;

(3)     All of RESELLER's equipment purchased from TOSCO or its predecessor in interest, regardless of when purchased; and

(4)     All proceeds of RESELLER's inventory, accounts receivable and equipment. RESELLER agrees to sign all financing statements and renewals as necessary to provide public record of this security interest.

(b)     In the event of insolvency of RESELLER, assignment for benefit of creditors, the institution of bankruptcy, insolvency, reorganization, receivership, debt adjustment, or liquidation proceedings, by or against RESELLER, or failure of RESELLER to perform any of the obligations of payment in accordance with the terms of payment established by TOSCO from time to time, TOSCO shall have the option without notice or demand upon RESELLER to declare an event of default under the Uniform Commercial Code, and upon any such default, TOSCO may declare all of RESELLER's indebtedness to TOSCO immediately due and payable. Thereafter TOSCO may proceed to enforce payment and may exercise any and all rights available to it.  In addition, TOSCO reserves the right to require a security deposit, letter of credit, and/or personal guaranty in accordance with TOSCO's RESELLER security policy in effect from time to time.



**41.   LEGAL FEES.**
   (a)      In the event either party to this Agreement retains counsel and/or institutes a mediation, arbitration proceeding, or lawsuit for violation of or to enforce any of the covenants, obligations and/or conditions of this Agreement, or if either party initiates a mediation, arbitration proceeding, or lawsuit against the other for a declaration of rights under this Agreement, or if either party intervenes in a lawsuit in which the other is a party, to enforce or protect its interests or rights hereunder, the prevailing party shall be entitled to reimbursement of all of its costs, expenses and reasonable attorney fees incurred in connection therewith from the other party.

   (b)      RESELLER agrees to pay all attorney fees, costs of suit and reasonable expenses incurred by TOSCO in connection with the collection of any indebtedness owed, enforcement of indemnity protections or any liability of RESELLER to TOSCO.

**42.   ASSIGNMENT AND MODIFICATION.**
   No amendment or other modification of this Agreement shall be valid or binding on either party hereto unless in writing and executed by both parties.  RESELLER shall not assign this Agreement, or any part thereof or interest therein without the prior written consent of TOSCO.  Any unauthorized assignment shall be dismissed by TOSCO as invalid and void.

**43.   CHOICE OF LAW AND VENUE.**
   This Agreement shall be governed, construed and interpreted under and in accordance with the laws of the State where the Station is located.  Each party hereby expressly consents to exclusive jurisdiction of the courts of the State where the Station is located and of any Federal court located in Arizona in connection with any action or proceeding arising out of or relating to this Agreement.

**44.   CONTRACTING ENTITY.**
   (a)      The individual, partnership and/or corporation first set forth above as RESELLER is the only entity that TOSCO recognizes as the party contracting hereunder as RESELLER.  Any name RESELLER uses as a "d.b.a." or fictitious firm name shall not be recognized by TOSCO as the RESELLER.

   (b)      RESELLER agrees that all Business Documents (as defined below) required under this Agreement or in conjunction with the operation of the Station shall be identical to the identity of RESELLER in this Agreement.  RESELLER understands and acknowledges that Business Documents include, but are not limited to, business licenses, permits, business checking accounts, security agreements, financing statements, insurance polices, proofs of insurance, and utilities ("Business Documents").

   (c)      In the event TOSCO becomes aware of Business Documents containing names other than RESELLER's, upon written notice from TOSCO, RESELLER agrees that RESELLER shall promptly, at RESELLER's expense, correct the name on the Business Document(s) to be identical to the identify of RESELLER herein.  RESELLER understands that any other party, other than the named RESELLER, asserting that they are a party hereof will be dismissed as invalid.  Any and all transfers, sublets or sales shall be pursuant only to the Transfers, Subletting and Sales Section set forth herein.

   (d)      If RESELLER consists of more than one (1) person, each person's liability under this Agreement shall be joint and several.

**45.   EXHIBITS.**
   Exhibits **A, B, C, D,** and **E** referenced herein, and the preamble and recitals to this Agreement, are hereby incorporated herein and made a part hereof by this reference.



## 46.    ENTIRE AGREEMENT.

(a)    This Agreement cancels and supersedes, as of the Contract Date hereof, all prior written and or oral, expressed or implied, agreements between TOSCO and RESELLER in regards to the following:

(1)    RESELLER's and TOSCO's rights, duties and obligations in respect of RESELLER's operation of the Station;

(2)    The sale and delivery of TOSCO motor fuel at the Station and all the terms and conditions as to TOSCO's sale to RESELLER and RESELLER's purchase from TOSCO, of TOSCO motor fuels for sale at the Station; and

(3)    Any and all of the relationship which exists between TOSCO and RESELLER.

(b)    Neither TOSCO nor RESELLER is obligated by any inducement, statement, representation, promise or agreement made by either of them that is not included in this Agreement.

IN WITNESS WHEREOF, the parties have executed this Agreement effective as of the Contract Date first set forth above.

Tosco Corporation:

By  _____
     James Young
     District Manager

RESELLER: Reed Avenue Foodmart, LLC

By  _____
     Vinod Paul
     Managing Member



## EXHIBIT A

### #0045/2639045

### STATION LOCATION

Reed Avenue Foodmart, LLC
705 Harbour Pointe Place
West Sacramento, CA 95651



**EXHIBIT B**

**#0045/2639045**

**SIGNS**

| Quantity | Description: |
|---|---|
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |



**EXHIBIT C**
**#0045/2639045**

## HOURS OF OPERATION

For the months of January Through December - 24-hours Daily



**EXHIBIT D**
**#0045/2639045**

## QUARTERLY/ANNUAL MINIMUM VOLUME SCHEDULE

### AS OF DATE: May 1, 2002

**YEAR 1**

|  | 1st Qtr Jan-Mar | 2nd Qtr Apr-Jun | 3rd Qtr Jul-Sep | 4th Qtr Oct-Dec | Annual Jan-Dec |
|---|---|---|---|---|---|
| Fuel Volume | 450,000 | 450,000 | 450,000 | 450,000 | 1,800,000 |
| Total | 450,000 | 450,000 | 450,000 | 450,000 | 1,800,000 |

**YEAR 2**

|  | 1st Qtr Jan-Mar | 2nd Qtr Apr-Jun | 3rd Qtr Jul-Sep | 4th Qtr Oct-Dec | Annual Jan-Dec |
|---|---|---|---|---|---|
| Fuel Volume | 510,000 | 510,000 | 510,000 | 510,000 | 2,040,000 |
| Total | 510,000 | 510,000 | 510,000 | 510,000 | 2,040,000 |

**YEARS 3-10**

|  | 1st Qtr Jan-Mar | 2nd Qtr Apr-Jun | 3rd Qtr Jul-Sep | 4th Qtr Oct-Dec | Annual Jan-Dec |
|---|---|---|---|---|---|
| Fuel Volume | 600,000 | 600,000 | 600,000 | 600,000 | 2,400,000 |
| Total | 600,000 | 600,000 | 600,000 | 600,000 | 2,400,000 |





**EXHIBIT E**
**#0045/2639045**


## PETROLEUM MARKETING PRACTICES ACT (PMPA)

AN ACT To provide for the protection of franchised distributors and retailers of motor fuel and to encourage conservation of automotive gasoline and competitor in the marketing of such gasoline by requiring that information regarding the octane rating of automotive gasoline be disclosed to consumers.

*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled, That this Act may be cited as the "Petroleum Marketing Practices Act".*

TABLE OF CONTENTS

TITLE I-FRANCHISE PROTECTION

Sec. 2801. Definitions.
Sec. 2802. Franchise relationship; termination and nonrenewal.
Sec. 2803. Trial franchises and interim franchises; nonrenewal.
Sec. 2804. Notification of termination or nonrenewal.
Sec. 2805. Enforcement.
Sec. 2806. Relationship of this title to State law.

TITLE 1-FRANCHISE PROTECTION


DEFINITIONS

Sec. 2801. Definitions

As used in this subchapter:

(1)    (A) The term "**franchise**" means any contract-

         (i) between a refiner and a distributor,

         (ii) between a refiner and a retailer,

         (iii) between a distributor and another distributor, or

         (iv) between a distributor and a retailer,

under which a refiner or distributor (as the case may be) authorizes or permits a retailer or distributor to use, in connection with the sale, consignment, or distribution of motor fuel, a trademark which is owned or controlled by such refiner or by a refiner which supplies motor fuel to the distributor which authorizes or permits such use.

     (B) The term "**franchise**" includes-

         (i) any contract under which a retailer or distributor (as the case may be) is authorized or permitted to occupy leased marketing premises, which premises are to be employed in connection with the sale, consignment, or distribution of motor fuel under a trademark which is owned or controlled by such refiner or by a refiner which supplies motor fuel to the distributor which authorizes or permits such occupancy;

         (ii) any contract pertaining to the supply of motor fuel which is to be sold, consigned or distributed-

            (I) under a trademark owned or controlled by a refiner; or

            (II) under a contract which has existed continuously since May 15, 1973, and pursuant to  which, on May 15, 1973, motor fuel was sold, consigned or distributed under a trademark owned or controlled on such date by a refiner; and

            (iii) the unexpired portion of any franchise, as defined by the preceding provisions of this paragraph, which is transferred or assigned as authorized by the provisions of such franchise or by any applicable provision of State law which permits such transfer or assignment without regard to any provision of the franchise.



(2)   The term "**franchise relationship**" means the respective motor fuel marketing or distribution obligations and responsibilities of a franchisor and a franchisee which result from the marketing of motor fuel under a franchise.

(3)   The term "**franchisor**" means a refiner or distributor (as the case may be) who authorizes or permits, under a franchise, a retailer or distributor to use a trademark in connection with the sale, consignment, or distribution of motor fuel.

(4)   The term "**franchisee**" means a retailer or distributor (as the case may be) who is authorized or permitted, under a franchise, to use a trademark in connection with the sale, consignment, or distribution of motor fuel.

(5)   The term "**refiner**" means any person engaged in the refining of crude oil to produce motor fuel, and includes any affiliate of such person.

(6)   The term "**distributor**" means any person, including any affiliate of such person, who-

(A) purchases motor fuel for sale, consignment, or distribution to another; or

(B) receives motor fuel on consignment for consignment or distribution to his own motor fuel accounts or to accounts of his supplier, but shall not include a person who is an employee of, or merely serves as a common carrier providing transportation service for, such supplier.

(7)   The term "**retailer**" means any person who purchases motor fuel for sale to the general public for ultimate consumption.

(8)   The term "**marketing premises**" means, in the case of any franchise, premises which, under such franchise, are to be employed by the franchisee in connection with the sale, consignment, or distribution of motor fuel.

(9)   The term "**leased marketing premises**" means marketing premises owned, leased, or in any way controlled by a franchisor and which the franchisee is authorized or permitted, under the franchise, to employ in connection with the sale, consignment or distribution of motor fuel.

(10) The term "**contract**" means any oral or written agreement. For supply purposes, delivery levels during the same month of the previous year shall be prima facie evidence of an agreement to deliver such levels.

(11) The term "**trademark**" means any trademark, trade name, service mark, or other identifying symbol or name.

(12) The term "**motor fuel**" means gasoline and diesel fuel of a type distributed for use as a fuel in self-propelled vehicles designed primarily for use on public streets, roads, and highways.

(13) The term "**failure**" does not include-

(A) any failure which is only technical or unimportant to the franchise relationship;

(B) any failure for a cause beyond the reasonable control of the franchisee; or

(C)   any failure based on a provision of the franchise which is illegal or unenforceable under the law of any State (or subdivision thereof).

(14) The term "**fail to renew**" and "**nonrenewal**" mean, with respect to any franchise relationship, a failure to reinstate, continue, or extend the franchise relationship-

(A) at the conclusion of the term, or on the expiration date, stated in the relevant franchise;

(B) at any time, in the case of the relevant franchise which does not state a term of duration or an expiration date; or

(C) following a termination (on or after June 19, 1978) of the relevant franchise which was entered into prior to June 19, 1978, and has not been renewed after such date.

(15) The term "**affiliate**" means any person who (other than by means of a franchise) controls, is controlled by, or is under common control with, any other person.

(16) The term "**relevant geographic market area**" includes a State or a standard metropolitan statistical area as periodically established by the Office of Management and Budget.

(17) The term "**termination**" includes cancellation.

(18) The term "**commerce**" means any trade, traffic, transportation, exchange, or other commerce-



(A) between any State and any place outside of such State; or

(B) which affects any trade, transportation, exchange, or other commerce described in subparagraph (A).

(19)  The term "**State**" means any State of the United States, the District of Columbia, the Commonwealth of Puerto Rico, the Virgin Islands, American Samoa, Guam, and any other commonwealth, territory, or possession of the United States.

FRANCHISE RELATIONSHIP; TERMINATION AND NONRENEWAL

Sec. 2802.  Franchise relationship

(a)    General prohibition against termination or nonrenewal

Except as provided in subsection (b) of this section and section 2803 of this title, no franchisor engaged in the sale, consignment, or distribution of motor fuel in commerce may-

(1) terminate any franchise (entered into or renewed on or after June 19, 1978) prior to the conclusion of the term, or the expiration date, stated in the franchise; or

(2) fail to renew any franchise relationship (without regard to the date on which the relevant franchise was entered into or renewed).

(b)    Precondition and grounds for termination or nonrenewal

(l)  Any franchisor may terminate any franchise (entered into or renewed on or after June 19, 1978) or may fail to renew any franchise relationship, if-

(A) the notification requirements of section 2804 of this title are met; and

(B) such termination is based upon a ground described in paragraph (2) or such nonrenewal is based upon a ground described in paragraph (2) or (3).

(2) For purposes of this subsection, the following are grounds for termination of a franchise or nonrenewal of a franchise relationship:

(A) A failure by the franchisee to comply with any provision of the franchise, which provision is both reasonable and of material significance to the franchise relationship, if the franchisor first acquired actual or constructive knowledge of such failure-

(i) not more than 120 days prior to the date on which notification of termination or nonrenewal is given, if notification is given pursuant to section 2804(a) of this title; or

(ii) not more than 60 days prior to the date on which notification of termination or nonrenewal is given, if less than 90 days notification is given pursuant to section 2804(b)(1) of this title.

(B) A failure by the franchisee to exert good faith efforts to carry out the provisions of the franchise, if-

(i) the franchisee was apprised by the franchisor in writing of such failure and was afforded a reasonable opportunity to exert good faith efforts to carry out such provisions; and

(ii) such failure thereafter continued within the period which began not more than 180 days before the date notification of termination or nonrenewal was given pursuant to section 2804 of this title.

(C) The occurrence of an event which is relevant to the franchise relationship and as a result of which termination of the franchise or nonrenewal of the franchise relationship is reasonable, if such event occurs during the period the franchise is in effect and the franchisor first acquired actual or constructive knowledge of such occurrence-

(i) not more than 120 days prior to the date on which notification of termination or nonrenewal is given, if notification is given pursuant to section 2804(a) in this title; or

(ii) not more than 60 days prior to the date on which notification of termination or nonrenewal is given, if less than 90 days notification is given pursuant to section 2804(b)(1) in this title.



(D) An agreement, in writing, between the franchisor and the franchisee to terminate the franchise or not to renew the franchise relationship, if—

(i) such agreement is entered into not more than 180 days prior to the date of such termination or, in the case of nonrenewal, not more than 180 days prior to the conclusion of the term, or the expiration date, stated in the franchise;

(ii) the franchisee is promptly provided with a copy of such agreement, together with the summary statement described in section 2804(d) of this title; and

(iii) within 7 days after the date on which the franchisee is provided a copy of such agreement, the franchisee has not posted by certified mail a written notice to the franchisor repudiating such agreement.

(E) In the case of any franchise entered into prior to June 19, 1978, and in the case of any franchise entered into or renewed on or after such date (the term of which is 3 years or longer, or with respect to which the franchisee was offered a term of 3 years or longer), a determination made by the franchisor in good faith and in the normal course of business to withdraw from the marketing of motor fuel through retail outlets in the relevant geographic market area in which the marketing premises are located, if—

(i) such determination-

(I) was made after the date such franchise was entered into or renewed, and

(II) was based upon the occurrence of changes in relevant facts and circumstances after such date;

(ii) the termination or nonrenewal is not for the purpose of converting the premises, which are the subject of the franchise, to operation by employees or agents of the franchisor for such franchisor's own account; and

(iii) in the case of leased marketing premises-

(I) the franchisor, during the 180-day period after notification was given pursuant to section 2804 in this title, either made a bona fide offer to sell, transfer, or assign to the franchisee such franchisor's interests in such premises, or, if applicable, offered the franchisee a right of first refusal of at least 45 days duration of an offer, made by another, to purchase such franchisor's interest in such premises; or

(II) in the case of the sale, transfer, or assignment to another person of the franchisor's interest in such premises in connection with the sale, transfer, or assignment to such other person of the franchisor' interest in one or more other marketing premises, if such other person offers, in good faith, a franchise to the franchisee on terms and conditions which are not discriminatory to the franchisee as compared to the franchisee then currently being offered by such other person or franchises then in effect and with respect to which such other person is the franchisor.

(3) For purposes of this subsection, the following are grounds for **nonrenewal** of a franchise relationship:

(A) The failure of the franchisor and the franchisee to agree to changes or additions to the provisions of the franchise, if—

(i) such charges or additions are the result of determinations made by the franchisor in good faith and in the normal course of business; and

(ii) such failure is not the result of the franchisor's insistence upon such changes or additions for the purpose of converting the leased marketing premises to operation by employees or agents of the franchisor for the benefit of the franchisor or otherwise preventing the renewal of the franchise relationship.

(B) The receipt of numerous bona fide customer complaints by the franchisor concerning the franchisee's operation of the marketing premises, if—

(i) the franchisee was promptly apprised of the existence and nature of such complaints following receipt of such complaints by the franchisor; and

(ii) if such complaints related to the condition of such premises or to the conduct of any employee of such franchisee, the franchisee did not promptly take action to cure or correct the basis of such complaints.

(C) A failure by the franchisee to operate the marketing premises in a clean, safe, and healthful manner, if the franchisee failed to do so on two or more previous occasions and the franchisor notified the franchisee of such failures.

(D) In the case of any franchise entered into prior to June 19, 1978 (the unexpired term of which, on such date, is 3 years or longer) and, in the case of any franchise entered into or renewed on or after such date (the term of which was 3 years



or longer, or with respect to which the franchisee was offered a term of 3 years or longer), a determination made by the franchisor in good faith and in the normal course of business, if-

(i) such determination is-

(I) to convert the leased marketing premises to a use other than the sale or distribution of motor fuel,

(II) to materially alter, add to, or replace such premises,

(III) to sell such premises, or

(IV) that renewal of the franchise relationship is likely to be uneconomical to the franchisor despite any reasonable changes or reasonable additions to the provisions of the franchise which may be acceptable to the franchisee;

(ii) with respect to a determination referred to in subclause (II) or (IV), such determination is not made for the purpose of converting the leased marketing premises to operation by employees or agents of the franchisor for such franchisor's own account; and

(iii) in the case of leased marketing premises such franchisor, during the 90-day period after notification was given pursuant to section 2804 of this section, either-

(I) made a bona fide offer to sell, transfer, or assign to the franchisee such franchisor's interests in such premises; or

(II) if applicable, offered the franchisee a right of first refusal of at least 45-days duration of an offer, made by another, to purchase such franchisor's interest in such premises.

(c)    Definition

As used in subsection (b)(2)(C) of this section, the term "an event which is relevant to the franchise relationship and as a result of which termination of the franchise or nonrenewal of the franchise relationship is reasonable" includes events such as-

(1) fraud or criminal misconduct by the franchisee relevant to the operation of the marketing premises;

(2) declaration of bankruptcy or judicial determination of insolvency of the franchisee;

(3) continuing severe physical or mental disability of the franchisee of at least 3 months duration which renders the franchisee unable to provide for the continued proper operation of the marketing premises;

(4) loss of the franchisor's right to grant possession of the leased marketing premises through expiration of an underlying lease, if-

(A) the franchisee was notified in writing, prior to the commencement of the term of the then existing franchise-

(i) of the duration of the underlying lease; and

(ii) of the fact that such underlying lease might expire and not be renewed during the term of such franchise (in the case of termination) or at the end of such term (in the case of nonrenewal);

(B) during the 90-day period after notification was given pursuant to section 2804 of this title, the franchisor offers to assign to the franchise any option to extend the underlying lease or option to purchase the marketing premises that is held by the franchisor, except that the franchisor may condition the assignment upon receipt by the franchisor of-

(i) an unconditional release executed by both the landowner and the franchisee releasing the franchisor from any and all liability accruing after the date of the assignment for-

(I) financial obligations under the option (or the resulting extended lease or purchase agreement);

(II) environmental contamination to (or originating from) the marketing premises; or

(III) the operation or condition of the marketing premises; and

(ii) an instrument executed by both the landowner and the franchisee that ensures the franchisor and the contractors of the franchisor reasonable access to the marketing premises for the purpose of testing for and remediating any environmental contamination that may be present at the premises; or



(C) in a situation in which the franchisee acquires possession of the leased marketing premises effective immediately after the loss of the right of the franchisor to grant possession (through an assignment pursuant to subparagraph (B) or by obtaining a new lease or purchasing the marketing premises from the landowner), the franchisor (if requested in writing by the franchisee not later than 30 days after notification was given pursuant to section 2804 of this title), during the 90-day period after notification was given pursuant to section 2804 of this title-

(i) made a bona fide offer to sell, transfer, or assign to the franchisee the interest of the franchisor in any improvements or equipment located on the premises; or

(ii) if applicable, offered the franchisee a right of first refusal (for at least 45 days) of an offer, made by another person, to purchase the interest of the franchisor in the improvements and equipment.

(5) condemnation or other taking, in whole or in part, of the marketing premises pursuant to the power of eminent domain;

(6) loss of the franchisor's right to grant the right to use the trademark which is the subject of the franchise, unless such loss was due to trademark abuse, violation of Federal or State law, or other fault or negligence of the franchisor, which such abuse, violation, or other fault or negligence is related to action taken in bad faith by the franchisor;

(7) destruction (other than by the franchisor) of all or a substantial part of the marketing premises;

(8) failure by the franchisee to pay to the franchisor in a timely manner when due all sums to which the franchisor is legally entitled;

(9) failure by the franchisee to operate the marketing premises for-

(A) 7 consecutive days, or

(B) such lesser period which under the facts and circumstances constitutes an unreasonable period of time;

(10) willful adulteration, mislabeling or misbranding of motor fuels or other trademark violations by the franchisee;

(11) knowing failure of the franchisee to comply with Federal, State or local laws or regulations relevant to the operation of the marketing premises; and

(12) conviction of the franchisee of any felony involving moral turpitude.

(d)   Compensation, etc., for franchisee upon condemnation or destruction of marketing premises

In the case of any termination of a franchise (entered into or renewed on or after June 19, 1978), or in the case of any nonrenewal of a franchise relationship (without regard to the date on which such franchise relationship was entered into or renewed)-

(1) if such termination or nonrenewal is based upon an event described in subsection (c)(5) of this section, the franchisor shall fairly apportion between the franchisor and the franchisee compensation, if any, received by the franchisor based upon any loss of business opportunity or good will; and

(2) if such termination or nonrenewal is based upon an event described in subsection (c)(7) of this section and the leased marketing premises are subsequently rebuilt or replaced by the franchisor and operated under a franchise, the franchisor shall, within a reasonable period of time, grant to the franchisee a right of first refusal of the franchise under which such premises are to be operated.


TRIAL FRANCHISES AND INTERIM FRANCHISES; NONRENEWAL

Section 2803. Trial and interim franchises

(a)   Nonapplicability of statutory nonrenewal provisions

The provisions of section 2802 of this title shall not apply to the nonrenewal of any franchise relationship-

(1) under a trial franchise; or

(2) under an interim franchise.

(b)   Definitions

For purposes of this section-



(1) The term "**trial franchise**" means any franchise-

    (A) which is entered into on or after June 19, 1978;

    (B) the franchisee of which has not previously been a parry to a franchise with the franchisor;

    (C) the initial term of which is for a period of not more than 1 year; and

    (D) which is in writing and states clearly and conspicuously-

        (i) that the franchise is a trial franchise;

        (ii) the duration of the initial term of the franchise;

        (iii) that the franchisor may fail to renew the franchise relationship at the conclusion of the initial term stated in the franchise by notifying the franchisee, in accordance with the provisions of section 2804 of this title, of the franchisor's intention not to renew the franchise relationship; and

        (iv) that the provisions of section 2802 of this title, limiting the right of a franchisor to fail to renew a franchise relationship, are not applicable to such trial franchise.

    (2) The term "**trial franchise**" does not include any unexpired period of any term of any franchise (other than a trial franchise, as defined by paragraph (1)) which was transferred or assigned by a franchisee to the extent authorized by the provisions of the franchise or any applicable provision of State law which permits such transfer or assignment, without regard to which provision of the franchise.

    (3) The term "**interim franchise**" means any franchise-

    (A) which is entered into on or after the date of June 19, 1978;

    (B) the term of which, when combined with the terms of all prior interim franchises between the franchisor and the franchisee, does not exceed 3 years;

    (C) the effective date of which occurs immediately after the expiration of a prior franchise, applicable to the marketing premises, which was not renewed if such nonrenewal-

        (i) was based upon a determination described in section 2802(b)(2)(E) of this title, and

        (ii) the requirements of section 2802(b)(2)(E) of this title were satisfied; and

    (D) which is in writing and states clearly and conspicuously-

        (i) that the franchise is an interim franchise;

        (ii) the duration of the franchise; and

        (iii) that the franchisor may fail to renew the franchise at the conclusion of the term stated in the franchise based upon a determination made by the franchisor in good faith and in the normal course of business to withdraw from the marketing of motor fuel through retail outlets in the relevant geographic market area in which the marketing premises are located if the requirements of section 2802(b)(2)(E) (ii) and (iii) of this title are satisfied.

(c)   Nonrenewal upon meeting statutory notification requirements

If the notification requirements of section 2804 of this title are met, any franchisor may fail to renew any franchise relationship-

    (1) under any trial franchise, at the conclusion of the initial term of such trial franchise; and

    (2) under any interim franchise, at the conclusion of the term of such interim franchise, if-
        (A) such nonrenewal is based upon a determination described in section 2802(b)(2)(E) of this title; and

        (B) the requirements of section 2802((b)(2)(E) (ii) and (iii) of this title are satisfied.

NOTIFICATION OF TERMINATION OR NONRENEWAL

Sec. 2804. Notification of termination or nonrenewal of franchise relationship



(a)   General requirements applicable to franchisor

Prior to termination of any franchise or nonrenewal of any franchise relationship, the franchisor shall furnish notification of such termination or such nonrenewal to the franchisee who is a party to such franchise or such franchise relationship-

(1) in the manner described in subsection (c) of this section; and

(2) except as provided in subsection (b) of this section, not less than 90 days prior to the date on which such termination or nonrenewal takes effect.

(b)   Additional requirements applicable to franchisor

(1) In circumstances in which it would not be reasonable for the franchisor to furnish notification, not less than 90 days prior to the date on which termination or nonrenewal takes effect, as required by subsection (a)(2) of this section-

(A) such franchisor shall furnish notification to the franchisee affected thereby on the earliest date on which furnishing of such notification is reasonably practicable; and

(B) in the case of leased marketing premises, such franchisor -

(i) may not establish a new franchise relationship with respect to such premises before the expiration of the 30 day period which begins-

(I) on the date notification was posted or personally delivered, or

(II) if later, on the date on which such termination or nonrenewal takes effect; and

(ii) may, if permitted to do so by the franchise agreement, repossess such premises and, in circumstances under which it would be reasonable to do so, operate such premises through employees or agents.

(2) In the case of any termination of any franchise or any nonrenewal of any franchise relationship pursuant to the provisions of section 2802(b)(2)(E) of this title or section 2803(c)(2) of this title, the franchisor shall-

(A) furnish notification to the franchisee not less than 180 days prior to the date on which such termination or nonrenewal takes effect; and

(B) promptly provide a copy to such notification, together with a plan describing the schedule and conditions under which the franchisor will withdraw from the marketing of motor fuel through retail outlets in the relevant geographic area, to the Governor of each State which contains a portion of such area.

(c)   Manner and form of notification

Notification under this section-

(1) shall be in writing;

(2) shall be posted by certified mail or personally delivered to the franchisee; and

(3) shall contain-

(A) a statement of intention to terminate the franchise or not to renew the franchise relationship, together with the reasons therefor,

(B) the date on which such termination or nonrenewal takes effect; and

(C) the summary statement prepared under subsection (d) of this section.

(d)   Preparation, publication, etc., of statutory summaries

(l) Not later than 30 days after June 19, 1978, the Secretary of Energy shall prepare and publish in the Federal Register a simple and concise summary of the provisions of this subchapter, including a statement of the respective responsibilities of, and the remedies and relief available to, any franchisor and franchisee under this subchapter.

(2) In the case of summaries required to be furnished under the provisions of section 2802((b)(2)(D) of this title or subsection (c)(3)(C) of this section before the date of publication of such summary in the Federal Register, such summary may be furnished not later than 5 days after it is so published rather than at the time required under such provisions.



## ENFORCEMENT

Sec. 2805. Enforcement provisions

(a)   Maintenance of civil action by franchisee against franchisor; jurisdiction and venue; time for commencement of action

If a franchisor fails to comply with the requirements of section 2802 or 2803 of this title, the franchise may maintain a civil action against such franchisor. Such action may be brought, without regard to the amount in controversy, in the district court of the United States in any judicial district in which the principal place of business of such franchisor is located or in which such franchisee is doing business, except that no such action may be maintained unless commenced within 1 year after the later of-

    (1) the date of termination of the franchise or nonrenewal of the franchise relationship; or

    (2) the date the franchisor fails to comply with the requirements of section 2802 or 2803 of this title.

(b)   Equitable relief by court; bond requirements; grounds for nonexercise of court's equitable powers

    (1) In any action under subsection (a) of this section, the court shall grant such equitable relief as the court determines is necessary to remedy the effects of any failure to comply with the requirements of section 2802 or 2803 of this title, including declaratory judgment, mandatory or prohibitive injunctive relief, and interim equitable relief.

    (2) Except as provided in paragraph (3), in any action under subsection (a) of this section, the court shall grant a preliminary injunction if-

        (A) the franchisee shows-

            (i) the franchise of which he is a party has been terminated or the franchise relationship to which he is a party has not been renewed, and

            (ii) there exist sufficiently serious questions going to the merits to make such questions a fair ground for litigation; and

        (B) the court determines that, on balance, the hardships imposed upon the franchisor by the issuance of such preliminary injunctive relief will be less than the hardship which would be imposed upon such franchisee if such preliminary injunctive relief were not granted.

    (3) Nothing in this subsection prevents any court from requiring the franchisee in any action under subsection (a) of this section to post a bond, in an amount established by the court, prior to the issuance or continuation of any equitable relief.

    (4) In any action under subsection (a) of this section, the court need not exercise its equity powers to compel continuation or renewal of the franchise relationship if such action was commenced-

        (A) more than 90 days after the date on which notification pursuant to section 2804(a) of this title was posted or personally delivered to the franchisee;

        (B) more than 180 days after the date on which notification pursuant to section 2804(b)(2) of this title was posted or personally delivered to the franchisee; or

        (C) more than 30 days after the date on which the termination of such franchise or the nonrenewal of such franchise relationship takes effect if less than 90 days notification was provided pursuant to section 2804(b)(1) of this title.

(c)   Burden of proof; burden of going forward with evidence

In any action under subsection (a) of this section, the franchisee shall have the burden of proving the termination of the franchise or the nonrenewal of the franchise relationship. The franchisor shall bear the burden of going forward with evidence to establish as an affirmative defense that such termination or nonrenewal was permitted under section 2802(b) or 2803 of this title, and, if applicable, that such franchisor complied with the requirements of section 2802(d) of this title.

(d)   Actual and exemplary damages and attorney and expert witness fees to franchisee; determination by court of right to exemplary damages and amount; attorney and expert witness fees to franchisor for frivolous actions

(1) If the franchisee prevails in any action under subsection (a) of this section, such franchisee shall be entitled-

        (A) consistent with the Federal Rules of Civil Procedure, to actual damages;



(B) in the case of any such action which is based upon conduct of the franchisor which was in willful disregard of the requirements of section 2802 or 2803 of this title, or the rights of the franchisee thereunder, to exemplary damages, where appropriate; and

(C) to reasonable attorney and expert witness fees to be paid by the franchisor, unless the court determines that only nominal damages are to be awarded to such franchisee, in which case the court, in its discretion, need not direct that such fees be paid by the franchisor.

(2) The question of whether to award exemplary damages and the amount of any such award shall be determined by the court and not by a jury.

(3) In any action under subsection (a) of this section, the court may, in its discretion direct that reasonable attorney and expert witness fees be paid by the franchisee if the court finds that such action is frivolous.

(e)    Discretionary power of court to compel continuation or renewal of franchise relationship; grounds for noncompulsion; right of franchisee to actual damages and attorney and expert witness fees unaffected

(1) In any action under subsection (a) of this section with respect to a failure of a franchisor to renew a franchise relationship in compliance with the requirements of section 2802 of this title, the court may not compel a continuation or renewal of the franchise relationship if the franchisor demonstrates to the satisfaction of the court that-

(A) the basis for such nonrenewal is a determination made by the franchisor in good faith and in the normal course of business-

(i) to convert the leased marketing premises to a use other than the sale or distribution of motor fuel,

(ii) to materially alter, add to, or replace such premises,

(iii) to sell such premises,

(iv) to withdraw from the marketing of motor fuel through retail outlets in the relevant geographic market area in which the marketing premises are located, or

(v) that renewal of the franchise relationship is likely to be uneconomical to the franchisor despite any reasonable changes or reasonable additions to the provisions of the franchise which may be acceptable to the franchisee; and

(B) the requirements of section 2804 of this title have been complied with.

(2) The provisions of paragraph (1) shall not affect any right of any franchisee to recover actual damages and reasonable attorney and expert witness fees under subsection (d) of this section if such nonrenewal is prohibited by section 2802 of this title.

(f)    Release or waiver of rights

(1)   No franchisor shall require, as a condition of entering into or renewing the franchise relationship, a franchisee to release or waive-

(A) any right that the franchisee has under this subchapter or other Federal law; or

(B) any right that the franchisee may have under any valid and applicable State law.

(2) No provision of any franchise shall be valid or enforceable if the provision specifies that the interpretation or enforcement of the franchise shall be governed by the law of any State other than the State in which the franchisee has the principal place of business of the franchisee.

## RELATIONSHIP OF THIS TITLE TO STATE LAW

Sec. 2806. Relationship of statutory provisions to State and local laws

(a)    Termination or nonrenewal of franchise

(1) To the extent that any provision of this subchapter applies to the termination (or the furnishing of notification with respect thereto) of any franchise, or to the nonrenewal (or the furnishing of notification with respect thereto) of any franchise relationship, no State or any political subdivision thereof may adopt, enforce, or continue in effect any provision of any law or regulation (including any remedy or penalty applicable to any violation thereof) with respect to termination (or the furnishing to notification with respect thereto) of any such franchise or to the nonrenewal (or the furnishing of notification with respect



thereto) of any such franchise relationship unless such provision of such law or regulation is the same as the applicable provision of this subchapter.

(2) No State or political subdivision of a State may adopt, enforce, or continue in effect any provision of law (including a regulation) that requires a payment for the goodwill of a franchisee on the termination of a franchise of nonrenewal of a franchise relationship authorized by this subchapter.

(b)   Transfer or assignment of franchise

(1) Nothing in this subchapter authorizes any transfer or assignment of any franchise or prohibits any transfer or assignment of any franchise as authorized by the provisions of such franchise or by any applicable provision of State law which permits such transfer or assignment without regard to any provision of the franchise.

(2) Nothing in this subchapter shall prohibit any State from specifying the terms and conditions under which any franchise or franchise relationship may be transferred to the designated successor of a franchisee upon the death of the franchisee.

Reed Avenue Foodmart, LLC
705 Harbour Pointe Place
West Sacramento, CA 95691

STATION #:  0045/2639045
ACCOUNT NO.# 99871681
EFFECTIVE DATE: May 1, 2002
EXPIRATION DATE:  April 30, 2012

### UNION 76 BRANDED FACILITY ALLOWANCE AGREEMENT

Dear Reseller:
In order to meet offers that have previously been made to you by one or more of our competitors, we
agree to give you the following facility allowance, relating to that certain Station referenced above, for each
gallon of motor fuel purchased for the Station pursuant to our Union 76 Branded Reseller Agreement.

| **PRODUCTS:** | **RATE** | **TIME PERIOD** |
|---|---|---|
| Union 76 Branded Motor Fuel | REDACTED /Gal (from gallon one) | Each Load/Off Invoice |

This facility allowance may be decreased or withdrawn by TOSCO at any time, upon no less than ninety
(90) days prior written notice to you.

We further agree that if TOSCO exercises its right to decrease or withdraw the facility allowance, you may
terminate your Union 76 Branded Reseller Agreement as of the effective date of the proposed change, or
withdrawal by written notice given to TOSCO, not less than ten (10) days prior to the effective date of the
change or withdrawal.

Please sign, date and return the copy of this letter indicating your acceptance of these terms.

Very truly yours,
TOSCO CORPORATION

_____
James Young
District Manager

RESELLER: Reed Avenue Foodmart, LLC

_____
Vinod Paul
Managing Member

UNDERSTOOD AND AGREED TO THIS

5th day of Aug , 2002.

(76facallow.doc revised 1/00)

Reed Avenue Foodmart, LLC ("Reseller")
705 Harbour Pointe Place
West Sacramento, CA 95651 ("Station")

Unit #: 0045/2639045
Account #: 99871681
Effective Date: May 1, 2002
Expiration Date: April 30, 2012

## RESELLER PAINT AND SIGN AMENDMENT

RESELLER and TOSCO have entered into a Union 76 Branded Reseller Agreement effective as of **May 1, 2002** ("Agreement") for the purchase and resale from TOSCO of Union 76 branded motor fuels and other related products at retail. RESELLER hereby agrees that this Reseller Paint and Sign Amendment ("Sign Amendment") shall modify and amend the Agreement to include the following request for certain painting work and sign installation ("Signage").

1.      RESELLER has requested TOSCO to perform certain painting and signage work at RESELLER's Station at the above address.  The maintenance, installation and care of the Signage shall be governed by the terms and conditions set forth herein this Sign Amendment.

2.      For the purpose of advertising and identifying the Station as being a Union 76 branded service station available for resale to the motoring public.  As of the date first indicated above, TOSCO and RESELLER agree that the total cost of the painting and sign installation will be **$25,000.00.**

3.      TOSCO agrees to perform the painting work and sign installation at the Station under the following terms and conditions:

(A)     So long as the tanks, dispenser and pumps installed at the Station are used for the purpose of storing and dispensing Union 76 branded gasolines and diesel fuels for resale to the motoring public, RESELLER hereby grants TOSCO the right and privilege of painting and maintaining thereon such Union 76 brand names, trademarks, trade dress, insignia, colors and other Union 76 branded appurtenances (collectively referred to herein as "Union 76 Trade Dress") as TOSCO deems necessary or proper to identify and advertise the Station as offering Union 76 branded motor fuels.

(B)     RESELLER hereby agrees to sell Union 76 branded motor fuels only under the Union 76 brand.  RESELLER will not sell or offer to sell any other brand of motor fuels.

(C)     In the event RESELLER ceases to handle, store and offer for resale Union 76 branded motor fuels at the Station, or in the event RESELLER commences offering from the Station any motor fuels produced by other motor fuel producers without TOSCO's express

written permission, TOSCO will immediately discontinue to supply RESELLER and shall remove any Union 76 Trade Dress installed by TOSCO in identifying or advertising Union 76 motor fuels, at RESELLER's expense. In addition, RESELLER will reimburse TOSCO the amount of painting and sign installation costs as set forth above in item # 2, less one sixth (1/6th) of such cost for each full period of six (6) months from the date such painting and sign installation is completed to the date RESELLER ceases handling Union 76 branded motor fuels or commence the handling of other motor fuels or products from the Station.

3.      All of said Union 76 Trade Dress installed by TOSCO shall be and remain the property of TOSCO at all times. RESELLER shall not assert any property or ownership right in said Union 76 Trade Dress at any time. TOSCO shall have the right at any and all times to enter upon the Station to inspect any or all of said Union 76 Trade Dress to:

        (A)     Determine if the obligations of RESELLER are being fulfilled under this Sign Amendment;

        (B)     Change or remove any or all of said Union 76 Trade Dress; and

        (C)     Maintain and/or repair any or all of the Union 76 Trade Dress, at RESELLER's expense, in the event RESELLER fails to maintain as required.

4.      TOSCO shall not be liable to RESELLER or to any third persons for injury or damage of any kind resulting from any incident or action not the direct result of the negligence or the willful misconduct of TOSCO or its employees; and RESELLER agrees to indemnify, defend and hold TOSCO harmless therefrom.

5.      . RESELLER agrees to keep all of said Union 76 Trade Dress free and clear of all other signs and RESELLER shall not install any other signs at the Station in a position that will obstruct the visibility of the Union 76 Trade Dress installed at the Station to street or highway traffic or divert motorists' attention from said signs.

6.      RESELLER agrees to keep clean all of the Union 76 Trade Dress signs, and further agrees to promptly replace, at RESELLER's expense, all burned out or defective lamps illuminating said signs.

7.      RESELLER agrees to operate all illuminated signs from sunset to closing time of each day, or from dusk until dawn if the Station is operated twenty-four (24) hours per day and RESELLER is to pay all expenses for the operation thereof.

8.      RESELLER agrees not to remove or alter, except as otherwise required to maintain, any of the Union 76 Trade Dress installed at the Station and RESELLER agrees to give TOSCO at least thirty (30) days prior written notice of any desired alteration or removal thereof.

9.      RESELLER does hereby give TOSCO permission to install the Union 76 Trade Dress at the Station.

**76**

IN WITNESS WHEREOF, the parties hereto have executed this Sign Amendment the day and year first referenced above.


Tosco Corporation                                RESELLER: Reed Avenue Foodmart, LLC


By_____              By_____
   James Young                                      Vinod Paul
   District Manager                                 Managing Member



                               Consent

The undersigned hereby approves and consents to the giving of the foregoing sign agreement subject to all the terms, covenants, conditions and agreements set forth therein and as owner and/or lessor of the real property at the above address, agrees that Tosco's sign(s) shall remain the personal property of Tosco at all times and hereby allows Tosco to remove said sign(s) at any time upon giving ten (10) working days' prior notice of such intent to remove.

ACCEPTED AND AGREED TO THIS 5th_____ DAY OF _Aug_____, 2002.

Dealer name: Reed Avenue Foodmart, LLC
Unit #:  0045/2639045
Account #: 99871681
Effective Date:  May 1, 2002
Expiration Date:  April 30, 2012

## 76 BRANDED TEMPERATURE ADJUSTMENT AGREEMENT

Dear Dealer/Reseller:

You have elected to purchase various motor fuels from TOSCO for the above subject service station, pursuant to a UNION 76 AGREEMENT ("Agreement").

By this Agreement you acknowledge that TOSCO has advised you that single deliveries made to your service station may be on a 60 degrees Fahrenheit temperature corrected basis, unless you elect to accept delivery on a gross gallonage basis.

You understand and agree that the election made herein shall be effective for a period of one (1) year from the date of this letter and then on a year to year basis thereafter unless canceled by written notice given thirty (30) calendar days prior to the expiration of any one (1) year period.

You hereby elect to accept single deliveries on the following basis (choose one):

____X____   Temperature Corrected

_____   Gross Gallonage

ACCEPTED AND AGREED TO

THIS _5th__ DAY OF _May_ , 2002.


Tosco Corporation

_____
James Young
District Manager

RESELLER: Reed Avenue Foodmart, LLC

_____
Vinod Paul
Managing Member

tempadj.doc (Rev. 3/31/97)

**MULTI-JURISDICTIONAL SALES TAX EXEMPTION CERTIFICATE**

To:  **TOSCO CORPORATION**                    Ref: # 0045/2639045
     **ATTN: TAX DEPT DC-59**                 Account:  # 99871681
     **P.O. BOX 52085**                       Dealer: Reed Avenue Foodmart, LLC
     **PHOENIX, AZ 85072-2085**
     **FEIN: 95-1865716**

Unless this certificate is marked below as a single purchase certificate, it shall be considered part of any order given to you and shall remain in force until revoked by written notice to you.
(Not to exceed four (4) years.)

          ( ) Single Purchase Certificate               ( ) Blanket Certificate

Certification:          (Check appropriate exemption)

I am engaged in the business of _____ and am engaged as a registered ( ) Wholesaler ( ) Retailer ( ) Manufacturer or ( ) Other
and as such am registered with the below listed states and cities within which your firm would deliver purchases to us, and all tangible personal property purchased by the undersigned
from Tosco Corporation, will be purchased as follows:

   ( )  For resale in the regular course of business without intervening use by me.
   ( )  To be incorporated as a material or part of other tangible personal property to be produced for sale by manufacturing, assembling, processing or refining or a chemical used for
        processing a new article of tangible personal property to be produced for sale.
   ( )  As a fuel source under Section 6358.1 of the California Revenue and Taxation Code.
   ( )  Other  (Describe exempt use and specify section of sales and use tax law covering this exemption.)

I further certify that if any property so purchased tax-free is used or consumed by the firm as to make it subject to a sales or use tax, we will pay the tax due directly to the proper taxing
authority when state law provides or inform the seller for added tax billing. This certificate shall be part of each order which we may hereafter give to you unless otherwise specified
and shall be valid until canceled by us, in writing, or revoked by the City or State.

I acknowledge that I am solely responsible for purchasing within the categories listed below.  I acknowledge that misuse of the resale privilege claimed by use of this certificate subjects
me to a penalty of 50% of the tax due, in addition to the tax, interest, and any other penalties imposed by applicable state law.

I (the buyer) certify that I am purchasing the items listed below for the exempt purpose indicated above.  (Check applicable boxes.)

| ( ) Anhydrous Ammonia | ( ) Coker Frac Bottoms | ( ) Ethanol | ( ) Heating Oil | ( ) Lube Oils | ( ) Reprocessed Fuel Oils |
|---|---|---|---|---|---|
| ( ) Asphalt | ( ) Coolant | ( ) FCC/Feed Stocks | ( ) Heavy Fuel Oils | ( ) Molten Sulfur | ( ) Stove Oil |
| ( ) Avgas | ( ) Crude Oils | ( ) Fuel Oils | ( ) Jet Fuel | ( ) MTBE | ( ) Sulfuric Acid |
| ( ) Bunker C | ( ) Cutter Stock | ( ) Gasoline | ( ) Kerosene | ( ) Petroleum Coke | ( ) TBA |
| ( ) Butanes | ( ) Diesel | ( ) Grease | ( ) Lube Additives | ( ) Propane | ( ) Undercoat |
| ( ) Carbon Black | ( ) Distillates | ( ) Green Coke | ( ) Lube Basestocks | ( ) Reformate | ( ) Wax |
| | | | | | ( ) Other _____ |

**States/Cities Registered**
**State          Resale/Sellers Permit #**

| | | | |
|---|---|---|---|
| AL _____ | HI _____ | MA* _____ | NM _____ | SD _____ |
| AZ _____ | ID _____ | MI _____ | NY _____ | TN _____ |
| AR _____ | IL _____ | MN _____ | NC* _____ | TX _____ |
| CA *JHF 100 -023252* IN* _____ | MS* _____ | ND _____ | UT _____ |
| CO _____ | IA _____ | MO _____ | OH* _____ | VT _____ |
| CT* _____ | KS _____ | MT _____ | OK _____ | VA* _____ |
| DC _____ | KY* _____ | NE _____ | OR _____ | WA _____ |
| DE _____ | LA* _____ | NV _____ | PA* _____ | WV* _____ |
| FL* _____ | ME _____ | NH _____ | RI _____ | WI _____ |
| GA _____ | MD _____ | NJ _____ | SC _____ | WY* _____ |

**CA Precollect Sales Tax SG#**          _____

I swear or affirm that the information on this form is true and correct as to every material matter.  **PLEASE TYPE OR PRINT CLEARLY**

   Reed Avenue Foodmart, LLC               Vinod Paul/Managing Member                        TBD
_____          _____          _____
        **Purchaser**                      **Print Name/Title**                  **Signature**

   705 Harbour Pointe Place                     REDACTED                              TBD
_____          _____          _____
         **Address**                          **FEIN**                           **Phone**

   West Sacramento, CA 95691                                                          TBD
_____          _____          _____
        **City, State ZIP**                     **Date**                         **Fax/E-Mail**

                                         916 371-1674
                               _____
                               **Contact Person/Phone Number**

         Effective Date: **January 1, 2000**               Through:  **December 31, 2002**

**Note**:  This certificate remains in force until revoked in writing by purchaser, applicable City/State authorities, or expires.  This certificate covers all transactions of "taxable products"
between the above named purchaser, Tosco Corporation and all of Tosco Corporation's Operating Divisions:

   1. Tosco Refining Company--A Division of Tosco Corporation        3. 76 Lubricants Company--A Division of Tosco Corporation
   2. Tosco Marketing Company--A Division of Tosco Corporation       4. 76 Products Company--a Division of Tosco Corporation

        Please send copies of the appropriate state certificates:

| CT | Sales & Use Resale Certificate | MA | Sales Tax Resale Cert. Form ST-4 | VA | Sales & Use Certificate Form ST-11 |
|---|---|---|---|---|---|
| FL | Reseller License | MS | Copy of Sales Tax Permit | WV | Exemption Certificate-WV/CST-280 |
| IN | Gen. Sales Tax Exempt Cert. ST-105 | NC | Certificate of Resale Form E-590 | WY | Exemption Certificate-ETS Form 101 |
| KY | KY Resale Certificate | OH | Sales Tax Certificate | | |
| LA | Exemption Certificate LGST-9 | PA | Exemption Certificate Rev 1220 | | |

Ectos-05 All States.xls

## Image Requirements Addendum to Union 76 Branded Reseller Agreement

Whereas, CONOCOPHILLIPS has implemented new image, signage, and trade dress requirements for its Union 76 branded service stations ("Image Requirements"), and

Whereas, RESELLER has agreed to comply with the Image Requirements at RESELLER's expense during the TERM, and

Whereas, CONOCOPHILLIPS desires to provide financial assistance to encourage RESELLER to bear the expense of complying with the Image Requirements and RESELLER desires to obtain CONOCOPHILLIPS financial assistance, on the terms set forth in this Addendum;

Now, Therefore, RESELLER and CONOCOPHILLIPS agree as follows:

1. RESELLER shall, at RESELLER's sole cost and expense, construct and install the Image Requirements, as required by CONOCOPHILLIPS, so as to cause RESELLER's service station to comply with the Oasis Image Requirements published on CONOCOPHILLIPS' website or published in such manner as CONOCOPHILLIPS may designate from time to time.

2. RESELLER acknowledges and agrees the estimates of the costs for complying with the Image Requirements provided by CONOCOPHILLIPS are for forecasting purposes and are subject to change due to timing, program definitions, material availability, changes in scope, or changes in costs for the materials provided by CONOCOPHILLIPS authorized vendors and service providers.

3. RESELLER acknowledges and agrees to:

   (a) follow CONOCOPHILLIPS processes and procedures for obtaining approval of the installation of the Image Requirements. RESELLER's scope of work and final plans are to be submitted in writing by RESELLER to a CONOCOPHILLIPS Marketing representative for review and approval prior to RESELLER seeking to obtain permits and ordering of equipment and materials. All entitlement and permitting conditions must also be reviewed and approved by CONOCOPHILLIPS' Marketing representative prior to final approval by the local approving authority; and

   (b) contract with CONOCOPHILLIPS' authorized vendors and service providers for the installation of the Image Requirements. RESELLER agrees to only employ and use vendors, specifications and materials as may be approved by CONOCOPHILLIPS. Alternate vendors or contractors selected by RESELLER shall not be employed or used for the installation of the Image Requirements without the prior written approval of a CONOCOPHILLIPS Marketing representative; and

   (c) notify and obtain from a CONOCOPHILLIPS Marketing representative a final inspection of the Image Requirements once installation is completed, including punch list items should another inspection be required, and obtain a final approval and acceptance notice from the CONOCOPHILLIPS Marketing representative; and

   (d) pay the authorized vendors and service providers directly and in full.

4. Notwithstanding the one year time limitation contained in Section 5(b)(3) of this Agreement, the completion date for the Image Requirements provided for in this Image Requirements Addendum is December 31, 2006 ("Completion Date"). RESELLER agrees that if such Image Requirements are not completed by the Completion Date, such failure is a material breach of the Agreement and is of material significance to the franchise relationship, and CONOCOPHILLIPS shall therefore have the right to terminate this Agreement.

5. CONOCOPHILLIPS shall not require RESELLER, and RESELLER shall not be obligated to spend more than $75,000 on the Image Requirements during any consecutive three-year period of the Term following the Completion Date.

6. In consideration of RESELLER's good faith compliance with the foregoing, upon completion of the installation of the Image Requirements, RESELLER shall submit to CONOCOPHILLIPS' Marketing representative for

review and verification full and complete receipts for RESELLER's expenditures, whereupon CONOCOPHILLIPS agrees to commence paying to RESELLER, on and at the time of each purchase of gasoline during the thirty six months following the installation of the Image Requirements, at the individual allowance rate based on the formula below (an "Oasis Image Allowance" which shall be credited on each invoice for motor fuel purchases by RESELLER) as follows:

| For Image Requirements Installed by: | % of RESELLER's Expenditures with Not to exceed Cap |
|---|---|
| April 30, 2005 | Up to but no greater than 115% - Not to exceed $[REDACTED] ([REDACTED] x 115%) |
| February 28, 2006 | Up to but no greater than 105% - Not to exceed $[REDACTED] ($[REDACTED] x 105%) |
| December 31, 2006 | Up to but no greater than 100% - Not to exceed $[REDACTED] |

7. The formula for calculating individual allowance rate shall be the greater of:

   rate = (RESELLER's Expenditures / most recent 36 month average motor fuel purchases x 36 months) or (RESELLER's Expenditures / most recent 12 month average motor fuel purchases x 36 months) - not to exceed [REDACTED] cpg

8. Payment of the Oasis Image Allowance shall begin, at the individual rate, the month following the Installation of the Image Requirements and the Marketing representative's approval of RESELLER's expenditures submitted by RESELLER, provided the CONOCOPHILLIPS Marketing representative's approval has been received in Houston by the 25th of the month, and shall continue until the Total Expenditures have been paid in full, or thirty six months have elapsed, whichever comes first. No Oasis image allowance shall be paid or extended beyond the **thirty sixth month**.

9. In the event that the RESELLER sells, assigns or transfers the Union 76 Branded Reseller Agreement pursuant to section 27 of the Agreement, at any time during the thirty six month Oasis Image Allowance pay back period, effective with the sale, assignment or transfer date any and all remaining allowance payments will be discontinued, and CONOCOPHILLIPS shall no longer be obligated to make any further Oasis Image Allowance payments.

10. This Agreement cancels and supersedes, as of the commencement date hereof, all prior oral representations and previously executed agreements between CONOCOPHILLIPS and RESELLER with respect to the subject matter of this Exhibit F.

Notwithstanding the foregoing, in the event RESELLER debrands the Station, or in the event the Agreement is terminated for any reason, at any time during the sixty months following the Completion Date, RESELLER shall be obligated to and shall promptly reimburse CONOCOPHILLIPS in full, without demand, for any and all Oasis Image Allowance payments made by CONOCOPHILLIPS to RESELLER as follows:

| If Debranding or Termination Occurs | Amount of Reimbursement Due from RESELLER |
|---|---|
| in year one following the Completion Date | 100% of all Oasis Image Allowance payments; or |
| in year two following the Completion Date | 80% of all Oasis Image Allowance payments; or |
| in year three following the Completion Date | 60% of all Oasis Image Allowance payments; or |
| in year four following the Completion Date | 40% of all Oasis Image Allowance payments; or |
| in year five following the Completion Date | 20% of all Oasis Image Allowance payment. |

Agreed and accepted on this ___15___ day of ___March___, 2005:

CONOCOPHILLIPS

By: _____
Otis Dancy
Account Representative

RESELLER:  REED AVENUE FOODMART, LLC

By: _____
VINOD PAUL
Reseller

## UNION 76 BRANDED RESELLER SUPPLY AGREEMENT
## FIRST AMENDMENT
## SITE NO.  0045 / 2639045

This First Amendment ("Amendment") is made as of September 13, 2002 ("Effective Date") between Tosco Corporation, a Nevada corporation ("TOSCO") and Reed Avenue Foodmart, LLC ("RESELLER") pertaining to site # 2639045 located at 705 Harbour Pointe Place, West Sacramento, CA  95651 ("Station").

### *Recitals*

A.     WHEREAS, TOSCO and RESELLER have previously entered into a Union 76 Branded Reseller Agreement dated February 14, 2002 ("Agreement"), commencing May 1, 2002 and expiring April 30, 2012;

B.     WHEREAS, TOSCO and RESELLER mutually agree to amend Section 2 of the Agreement titled Term.

NOW, THEREFORE, in consideration of the mutual covenants contained herein TOSCO and RESELLER agree as follows:

1.     The Term of the Agreement is hereby amended and shall commence on **September 9, 2002** and expire on **September 30, 2012**.

2.     This Amendment relates only to Section 2 of the Agreement, all other terms, conditions and provisions of the Agreement are incorporated herein and shall continue in full force and effect.

IN WITNESS WHEREOF, the parties being duly authorized do hereby execute this Amendment as of the Effective Date as set forth above.

RESELLER:  Reed Avenue Foodmart, LLC

By: _____

Vinod Paul
Managing Member

Witness

TOSCO CORPORATION:

By: _____

James Young
District Manager

Witness

cc:   Rent Dept.
      Credit Dept.
      James Young

(revised Reseller termmod.doc 2/28/2000sp)

# EXHIBIT B

## PERSONAL GUARANTY

This Personal Guaranty ("Guaranty") is entered into as of 7/25/02 ("Effective Date") and is in consideration of, and as an inducement for, Tosco Corporation, a Nevada corporation, its divisions, affiliates, subsidiaries and/or assigns (hereinafter referred to as "TOSCO") entering into certain agreements with Reed Avenue Foodmart, LLC (hereinafter referred to as "DEBTOR"), and in the further consideration of, and as a further inducement for, any credit extended, to be extended or continued, or any other financial accommodations given, to be given or continued, by TOSCO to DEBTOR, the undersigned Vinod Paul (hereinafter referred to as "GUARANTOR") provides this Guaranty.

NOW, THEREFORE, GUARANTOR agrees to the following:

1. GUARANTOR does hereby absolutely and unconditionally guarantee the prompt payment of any and all indebtedness heretofore or hereafter incurred by DEBTOR to TOSCO (the "Indebtedness"). GUARANTOR acknowledges TOSCO would not extend any credit to DEBTOR without the providing by GUARANTOR of this Guaranty, and acknowledges that GUARANTOR holds an interest, equitable or otherwise, in DEBTOR. The word "Indebtedness" is used herein in its most comprehensive sense and includes any and all advances, debts, obligations and liabilities of DEBTOR or any one or more of them heretofore, now or hereafter made, incurred or created, whether voluntarily or involuntarily and however arising, whether due or not due, absolute or contingent, liquidated or unliquidated, determined or undetermined, and whether DEBTOR may be liable individually or jointly with others. Such Indebtedness may include, but is not limited to, monies now owing or that may hereafter become owing under one or more of the following:

    (1)    On open account, whether billed or unbilled;

    (2)    For any services rendered or to be rendered;

    (3)    For merchandise or products sold or to be sold;

    (4)    For any rentals and other obligations under any lease or rental agreement; and

    (5)    On notes, checks, drafts, and any other instrument for the payment of money executed, or to be executed or endorsed, and delivered by DEBTOR to TOSCO.

2. GUARANTOR agrees that TOSCO may in TOSCO's absolute discretion without notice or demand and without prejudice to or in any way limiting or diminishing the liability of GUARANTOR under this Guaranty:

    (1)    Renew, compromise, extend, accelerate or otherwise change the time for payment of, or otherwise change the terms of the Indebtedness or any part thereof, including increase or decrease of the rate of interest thereon with the consent of DEBTOR;

    (2)    Take, modify, alter, release, reconvey, exchange or renew any security, or abstain from perfecting, acting on or otherwise taking advantage of any security;

    (3)    File or refrain from filing a claim in any bankruptcy proceeding of DEBTOR or any other GUARANTOR (if any);

    (4)    Realize on any Indebtedness;

    (5)    Take any checks, notes, or other obligations, secured or unsecured, in any amount, purportedly in payment of the whole or any part of any Indebtedness; and

(6)     Otherwise deal with the DEBTOR and other parties and security as TOSCO may deem appropriate.

3.     GUARANTOR agrees and acknowledges that this Guaranty shall be a general and continuing guaranty and shall cover all Indebtedness of DEBTOR, and where more than one entity is a part of DEBTOR, the several obligations of each entity as well as their joint obligations, including those obligations incurred at least ten (10) days after such time as TOSCO shall have actually received written notice of revocation of this Guaranty.

4.     GUARANTOR agrees that in order to revoke this Guaranty, GUARANTOR shall send notice to TOSCO by certified mail or overnight delivery to the following address: Tosco Corporation, 1500 North Priest Drive, Tempe, AZ. 85281, Attn:. Credit Manager, DC70. Such revocation shall apply only to such agreements, leases, extensions of credit, or other indebtedness or obligations entered into or created at least ten (10) days after the date of receipt of such notice of revocation, and shall not apply to Indebtedness thereafter becoming due and payable under agreements, leases, sales or other obligations entered into prior to such revocation. Any payments made after receipt of such notice of revocation shall be applied as TOSCO may elect

5.     Until full payment of any and all Indebtedness is paid to TOSCO, GUARANTOR waives all right of subrogation and benefit of or right to participate in any security now or hereafter held by TOSCO.

6.     GUARANTOR expressly waives all demands, presentments, notices of protest and of dishonor, and notices of very kind or nature, including those of any action or non-action on the part of DEBTOR, TOSCO, any co-guarantor (if applicable), or any creditor of DEBTOR. GUARANTOR expressly waives the right to require TOSCO to proceed against DEBTOR, or any co-guarantor (if applicable) or to proceed against or apply any security TOSCO may hold, and GUARANTOR waives the right to require TOSCO to pursue any other remedy for the benefit of GUARANTOR, and agrees that TOSCO may proceed against GUARANTOR for the amount hereby guaranteed without taking any action against DEBTOR, or any co-guarantor (if applicable) and without proceeding against or applying any security TOSCO may hold.

7.     GUARANTOR agrees and acknowledges that any and all debts and obligations, present and future, of DEBTOR to GUARANTOR, or any of them are hereby postponed to the obligations of DEBTOR to TOSCO, and all monies received by GUARANTOR or its representatives, successors or assigns thereon shall be held in trust for TOSCO and shall be paid over to TOSCO. Further, upon any liquidation or distribution of assets of DEBTOR, GUARANTOR agrees to assign to TOSCO any and all claims on account of any and all such debts and obligations, and TOSCO shall receive any and all dividends and payments on such debts and obligations until payment in full of any and all obligations of DEBTOR are paid to TOSCO.

8.     GUARANTOR irrevocably waives, disclaims and relinquishes any and all claims against DEBTOR which GUARANTOR otherwise has or would have by virtue of having executed this Guaranty, specifically including, but not limited to, all rights of indemnity, contribution or exoneration. GUARANTOR expressly subordinates any and all claim(s) against DEBTOR upon any account whatsoever to any claim(s) that TOSCO may have against DBBTOR at any time and for any reason.

9.     In the event DEBTOR is a partnership or other association, this Guaranty is to extend to the person or persons for the time being and from time to time carrying on the business now conducted by DEBTOR, notwithstanding any change or changes in the name or membership of DEBTOR.

10.     GUARANTOR agrees to pay any and all attorneys' fees, costs of suit and expenses incurred by TOSCO in connection with this Guaranty or in the collection of any of said Indebtedness from DEBTOR

or GUARANTOR.  GUARANTOR WAIVES THE RIGHT TO A JURY TRIAL IN ANY LAWSUIT RELATED TO THIS GUARANTY OR THE INDEBTEDNESS, OR BOTH.

11.     GUARANTOR waives and agrees not to assert or claim at any time any deductions to the amount guaranteed under this Guaranty for any claim, setoff, counterclaim, counter demand, recoupment or similar right, whether such claim, demand or right may be asserted by the DEBTOR, GUARANTOR, or both.

12.     This Guaranty is a general guaranty and is assignable, and when so assigned the GUARANTOR shall be bound as above to the assignees without in any manner affecting GUARANTOR's liability hereunder on any part of DEBTOR's obligations to TOSCO.

13.     This Guaranty shall inure to the benefit of and bind the heirs, administrators, executor, successors and assigns of TOSCO and each of GUARANTOR's, and if more than one entity is GUARANTOR then this Guaranty shall be construed as the joint and several obligation of each of the GUARANTORs. Where there is more than one DEBTOR named herein, reference herein to "DEBTOR" shall mean all and any one or more of them and the words used herein in the singular shall be deemed to have been used in the plural where the contexts and construction so require.

14.     This Guaranty shall be construed in accordance with the laws of the State of Arizona without regard to its choice of law rules.  Notice of acceptance of the Guaranty is hereby waived. This Guaranty contains the entire guaranty agreement between TOSCO and GUARANTOR.  GUARANTOR declares that this is a voluntary and unconditional guaranty and GUARANTOR does not rely in whole or in part on any oral representation of any kind whatsoever which may be made by any representative of TOSCO in the execution of this Guaranty.

15.     GUARANTOR authorizes TOSCO to obtain a credit report on GUARANTOR.

16.     Any married person who signs this Guaranty hereby expressly agrees that recourse may be made against both his or her separate property and community property interest for all obligations under this Guaranty and represents and warrants that this transaction is being entered into for the benefit of GUARANTOR's marital community.

IN WITNESS WHEREOF, GUARANTOR by a duly authorized representative does hereby execute this Guaranty as of the Effective Date first referenced above.

GUARANTOR

Witness: _____ (1) _____
                                    Vinod Paul  Principal

                                    V I N O D   P A U L
                                    Print Name

                             (2) _____
                                    Santosh Paul

                                    _____
                                    Print Name

# EXHIBIT C



January 30, 2013

Reed Avenue Food Mart LLC
705 Harbour Pointe Place
West Sacramento, CA  95651

RE:     Union 76 Branded Reseller Agreement dated May 1, 2002 ("Agreement") regarding Site 2639045
        located at 705 Harbour Pointe Place, West Sacramento, CA  95651 ("Station")

## NOTICE OF TERMINATION
## CERTIFIED MAIL – RETURN RECEIPT REQUESTED

Dear Reseller:

This notice is pursuant to the above referenced Agreement between Phillips 66 Company ("PSX"), successor by assignment from ConocoPhillips Company, and Reed Avenue Food Mart LLC.

As required by the Petroleum Marketing Practices Act ("PMPA"), PSX provides this written notice that your franchise relationship with PSX and the above referenced Agreement shall terminate **February 11, 2013 ("Termination Date")**.

It has been observed by, or reported to a PSX representative that as of January 1, 2013 Reseller has removed the Station's 76 logos, signage and information decals and that Reseller has ceased selling 76 branded motor fuels. As of the date of this notice, Reseller continues to fail to sell 76 branded motor fuels. Therefore, we are issuing you this notice of termination based upon your failure to comply with the material and significant provisions of the Agreement, namely:

1) Section 5(a)(1), which provides that Reseller will operate the Station for the promotion and sale of the branded motor fuels and motor oils and other merchandise, products and services licensed under the Agreement
2) Section 11(a), which provides Reseller shall continuously stock and offer for sale sufficient quantities of each grade and type of 76 branded motor fuels
3) Section 29(b)(9), which provides that Reseller shall comply with the use, operation and image standards and trademark requirements

Your failure to comply with the provisions of the Agreement is an event that is of material significance to the franchise relationship for which termination is reasonable.

Therefore, PSX does hereby terminate the Agreement and the franchise relationship created thereby effective as of the Termination Date. Termination of the Agreement and franchise relationship shall not discharge you from any debts and liabilities due and owing by you to PSX under the Agreement.  If not done so already PSX intends to take whatever actions are necessary to collect those sums from you, including open book account balances for goods sold and delivered, miscellaneous charges, and program monies previously advanced to you and not yet paid or otherwise retired in full.

PSX has ceased motor fuel deliveries to the Station.  Please also be advised that PSX will no longer accept transmittals for credit card transactions dated after the Termination Date.  Credit card transmittals submitted for transactions after the Termination Date will be returned.

In order to protect our brand, trademarks and trade dress from any unauthorized use or misrepresentation, you are required to take down the signs, displays, and trade dress of the brand at your Station, and destroy these materials at your expense.  If you fail to properly debrand this Station, PSX will do so at your expense.

Enclosed with this Notice is a copy of the Department of Energy Summary of Title I of the Petroleum Marketing Practices Act, as amended ("PMPA"), which we are required by the PMPA to provide you.

Should you have any questions regarding this notice please contact your Sales Representative.

Sincerely,

Douglas V. Stephan
Manager, Manager Wholesale Sales & Operations

Enclosure:    Summary of Title I of the PMPA

c:        David Vann, Sales Representative
          Douglas V. Stephan, Director Regional Sales
          John D. Smith
          Bill Buerster

# EXHIBIT D



Jayme L. Rogers
AB-3-368-01
411 South Keeler Ave
Bartlesville, OK 74003
918-977-6390
Jayme.L.Rogers@p66.com

March 20, 2013

Reed Avenue Food Mart LLC
705 Habour Pointe Place
West Sacramento, CA 95691

CERTIFIED MAIL
With Return Receipt
7011 1570 0000 2834 0269

## Final Demand Letter

**RE: Outstanding balance on Account Number 10052217 – Site 2639045**
**Reed Avenue Food Mart LLC**
**705 Harbour Pointe Place**
**West Sacramento, CA 95691**

This letter is to advise you that our records indicate as of today's business; your account carried with Phillips 66 Company under the name of Reed Avenue Food Mart, LLC has a balance due in the amount of **$406,796.70**. We have been unable to obtain payment for these invoices to date. Phillips 66 Company does hereby make demand upon Reed Avenue Food Mart, LLC in the amount of **Four Hundred, Six Thousand, and Seven Hundred Ninety Six dollars and 70 cents** for the unpaid invoices. Full payment must be received no later than end-of-business, **March 30, 2013**. A Summary of the Outstanding Debt is enclosed, which will reflect what items make up this outstanding balance.

Should you fail to make full payment on the outstanding debt by the due date, Phillips 66 Company will take whatever action deemed necessary to collect the **$406,796.70** past due amount, including outside collection and/or legal remedy, with associated costs.

To settle this matter promptly, please remit payment for the outstanding debt by wire transfer to the following bank account:

JP Morgan Chase
1 Chase Manhattan Plaza, 7th Floor
New York, NY 10005-1401
Chase (SWIFT code: REDACTED)
Routing REDACTED
Account REDACTED

Please reference your account number **10052217** on the detail for the wire transfer to ensure proper credit to your account. If you have any questions, please give me a call.

Regards,

Jayme L Rogers
Supervisor
Receivable Resolution

Enclosures: John Smith, David Vann, File

**U.S. Postal Service**™
**CERTIFIED MAIL**™ **RECEIPT**
(Domestic Mail Only; No Insurance Coverage Provided)

For delivery information visit our website at www.usps.com®

**OFFICIAL USE**

| | |
|---|---|
| Postage | $ |
| Certified Fee | |
| Return Receipt Fee (Endorsement Required) | |
| Restricted Delivery Fee (Endorsement Required) | |
| Total Postage & Fees | $ |

*Final Demand Site Address*

Postmark Here

*3-20-2013*

Sent To *Reed Avenue Food Mart*
Street, Apt. No.; or PO Box No. *705 Harbour Pointe Place*
City, State, ZIP+4 *West Sacramento, CA 95691*

PS Form 3800, August 2006       See Reverse for Instructions

7011 1570 0000 2834 0269

---

**SENDER: COMPLETE THIS SECTION**

- Complete items 1, 2, and 3. Also complete item 4 if Restricted Delivery is desired.
- Print your name and address on the reverse so that we can return the card to you.
- Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

*Reed Avenue Food Mart LLC*
*705 Harbour Pointe Place*
*West Sacramento, CA 95691*

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature
X _____   ☐ Agent   ☐ Addressee

B. Received by ( Printed Name )   C. Date of Delivery

D. Is delivery address different from item 1?   ☐ Yes
   If YES, enter delivery address below:   ☐ No

3. Service Type
   ☐ Certified Mail   ☐ Express Mail
   ☐ Registered   ☐ Return Receipt for Merchandise
   ☐ Insured Mail   ☐ C.O.D.

4. Restricted Delivery? (Extra Fee)   ☐ Yes

2. Article Number (Transfer from service label)
   7011 1570 0000 2834 0269

PS Form 3811, February 2004       Domestic Return Receipt       102595-02-M-1540

*Packet online*

# EXHIBIT E



Jayme L. Rogers
AB-3-368-01
411 South Keeler Ave
Bartlesville, OK 74003
918-977-6390
Jayme.L.Rogers@p66.com

March 20, 2013

Vinod Paul
550 Hawkcrest Circle
Sacramento, CA 95835

> **Sold To Number 10052217 – site 2639045**
> Reed Avenue Food Mart LLC
> 705 Harbour Pointe Place
> West Sacramento, CA 95691

RE:   Personal Guaranty dated July 25, 2002, executed by Vinod Paul

CERTIFIED MAIL with return receipt 7011 1570 0000 2834 0245

### *Personal Guarantor Demand Letter*

Dear Vinod Paul,

Under the above-referenced Guaranty, Vinod Paul (the" Guarantor") has unconditionally guaranteed payment of "all present and future indebtedness of Reed Avenue Food Mart, LLC" to Phillips 66 Company ("Phillips 66").  The Guaranty allows Phillips 66 to proceed against Guarantor for such indebtedness at any time.

As of the date of this letter, Reed Avenue Food Mart, LLC owes Phillips 66 $406,796.70 (the **"Indebtedness"**).  Phillips 66 hereby demands that Guarantor satisfy the indebtedness by remitting immediate payment of same to Phillips 66 by no later than end of business on **March 30, 2013.**  Payment should be remitted to Phillips 66 by wire transfer to the following bank account:

JP Morgan Chase
1 Chase Manhattan Plaza, 7th Floor
New York, NY 10005-1401
Chase (SWIFT code: REDACTED)
Routing REDACTED
Account REDACTED

Please contact me to discuss any questions you may have regarding this balance.  Should you fail to make payment by **March 25, 2013,** Phillips 66 will take whatever action it deems necessary to enforce the Guaranty (including without limitation commencement of a suit against Guarantor in a court of competent jurisdiction) to collect the Indebtedness plus reasonable fees as provided for under the Guaranty and applicable law.

Sincerely,

*Jayme L. Rogers*

Jayme L Rogers
Supervisor
Receivable Resolution

Enclosures:    Personal Guaranty
cc:                  File, John Smith, David Vann

**U.S. Postal Service**™
**CERTIFIED MAIL**™ **RECEIPT**
*(Domestic Mail Only; No Insurance Coverage Provided)*

For delivery information visit our website at www.usps.com®

## OFFICIAL USE

| | |
|---|---|
| Postage | $ |
| Certified Fee | |
| Return Receipt Fee (Endorsement Required) | |
| Restricted Delivery Fee (Endorsement Required) | |
| Total Postage & Fees | $ |

PG - Home

Postmark
Here

3-20-2013

Sent To  *Vinod Paul*
Street, Apt. No.; or PO Box No.  *550 Hawkcrest Circle*
City, State, ZIP+4  *Sacramento, CA 95691*

PS Form 3800, August 2006      See Reverse for Instructions

7011 1570 0000 2834 0245

PLACE STICKER AT TOP OF ENVELOPE TO THE RIGHT
OF THE RETURN ADDRESS, FOLD AT DOTTED LINE
CERTIFIED MAIL™

---

**SENDER: COMPLETE THIS SECTION**

- Complete items 1, 2, and 3. Also complete item 4 if Restricted Delivery is desired.
- Print your name and address on the reverse so that we can return the card to you.
- Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

*Vinod Paul*
*550 Hawkcrest Circle*
*Sacramento, CA 95691*

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature
X _____  ☐ Agent  ☐ Addressee

B. Received by (Printed Name)      C. Date of Delivery

D. Is delivery address different from item 1?  ☐ Yes
   If YES, enter delivery address below:  ☐ No

3. Service Type
   ☑ Certified Mail     ☐ Express Mail
   ☐ Registered         ☐ Return Receipt for Merchandise
   ☐ Insured Mail       ☐ C.O.D.

4. Restricted Delivery? (Extra Fee)      ☐ Yes

2. Article Number
   (Transfer from service label)      7011 1570 0000 2834 0245

PS Form 3811, February 2004      Domestic Return Receipt      102595-02-M-1540

*Pocket online*



Jayme L. Rogers
AB-3-368-01
411 South Keeler Ave
Bartlesville, OK  74003
918-977-6390
Jayme.L.Rogers@p66.com

March 20, 2013

Vinod Paul
705 Harbour Pointe Place
West Sacramento, CA 95691

>Sold To Number 10052217 – site 2639045
>Reed Avenue Food Mart LLC
>705 Harbour Pointe Place
>West Sacramento, CA 95691

RE:    Personal Guaranty dated July 25, 2002, executed by Vinod Paul

CERTIFIED MAIL with return receipt 7011 1570 0000 2834 0252

### *Personal Guarantor Demand Letter*

Dear Vinod Paul,

Under the above-referenced Guaranty, Vinod Paul (the" Guarantor") has unconditionally guaranteed payment of "all present and future indebtedness of Reed Avenue Food Mart, LLC" to Phillips 66 Company ("Phillips 66"). The Guaranty allows Phillips 66 to proceed against Guarantor for such indebtedness at any time.

As of the date of this letter, Reed Avenue Food Mart, LLC owes Phillips 66 **$406,796.70 (the "indebtedness").** Phillips 66 hereby demands that Guarantor satisfy the indebtedness by remitting immediate payment of same to Phillips 66 by no later than end of business on **March 30, 2013.** Payment should be remitted to Phillips 66 by wire transfer to the following bank account:

JP Morgan Chase
1 Chase Manhattan Plaza, 7th Floor
New York, NY 10005-1401
Chase (SWIFT code: CHASUS33)
Routing 021000021
Account 643625296

Please contact me to discuss any questions you may have regarding this balance.  Should you fail to make payment by **March 25, 2013,** Phillips 66 will take whatever action it deems necessary to enforce the Guaranty (including without limitation commencement of a suit against Guarantor in a court of competent jurisdiction) to collect the indebtedness plus reasonable fees as provided for under the Guaranty and applicable law.

Sincerely,

Jayme L. Rogers
Supervisor
Receivable Resolution

Enclosures:    Personal Guaranty
cc:               File, John Smith, David Venn

**SENDER:** *COMPLETE THIS SECTION*

- Complete items 1, 2, and 3. Also complete item 4 if Restricted Delivery is desired.
- Print your name and address on the reverse so that we can return the card to you.
- Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

Vinod Paul
705 Harbour Pointe PL
West Sacramento, CA 95691

*COMPLETE THIS SECTION ON DELIVERY*

A. Signature
X
☐ Agent
☐ Addressee

B. Received by ( *Printed Name* )   C. Date of Delivery

D. Is delivery address different from item 1?   ☐ Yes
   If YES, enter delivery address below:   ☐ No

3. Service Type
☐ Certified Mail   ☐ Express Mail
☐ Registered   ☐ Return Receipt for Merchandise
☐ Insured Mail   ☐ C.O.D.

4. Restricted Delivery? *(Extra Fee)*   ☐ Yes

2. Article Number
(Transfer from service label)

7011 1570 0000 2834 0252

PS Form 3811, February 2004   Domestic Return Receipt   102595-02-M-1540

Packet Online

---

**CERTIFIED MAIL**

**U.S. Postal Service**™
**CERTIFIED MAIL**™ **RECEIPT**
(Domestic Mail Only; No Insurance Coverage Provided)

For delivery information visit our website at www.usps.com®

OFFICIAL USE

PG Site

| | |
|---|---|
| Postage | $ |
| Certified Fee | |
| Return Receipt Fee (Endorsement Required) | |
| Restricted Delivery Fee (Endorsement Required) | |
| Total Postage & Fees | $ |

Postmark Here

3-20-2013

Sent To  Vinod Paul
Street, Apt. No.; or PO Box No.  705 Harbour Pointe Place
City, State, ZIP+4  West Sacramento, CA 95691

PS Form 3800, August 2006   See Reverse for Instructions

7011 1570 0000 2834 0252

# EXHIBIT F

BEIRNE, MAYNARD & PARSONS, L.L.P.

1300 POST OAK BOULEVARD

SUITE 2500

HOUSTON, TEXAS 77056-3000

MEAGAN P. WILDER

(713) 623-0887

FAX (713) 960-1527

DIRECT DIAL: (713) 871-6853
EMAIL: MWILDER@BMPLLP.COM

April 17, 2014

Reed Avenue Food Mart, LLC                        *Via CM-RRR and First Class Mail*
c/o Vinod Paul
705 Habour Pointe Place
West Sacramento, CA 95691

       Re:    Outstanding Amounts Owed to Phillips 66 Company

Dear Mr. Paul:

My firm represents Phillips 66 Company in regards to the collection of all amounts Reed Avenue Food Mart, LLC owes in connection with its Union 76 Branded Reseller Agreement with ConocoPhillips Company, as successor to Tosco Corporation by merger, dated February 14, 2002 ("Agreement").  ConocoPhillips has assigned the Agreement to Phillips 66.

From previous correspondence with Phillips 66, you know that Reed Avenue breached the Agreement and failed to pay $406,848.70 that is due and owing to Phillips 66.  Because prior attempts to resolve this matter have failed, Phillips 66 hereby makes a final demand for payment of the amounts owed under the Agreement.  You are advised that if payment in full is not received in my office within ten days of the date of this letter, or if you have not called me to make arrangements to satisfy the outstanding amounts owed by that date, I will advise Phillips 66 to file suit immediately to recover the principal amount owed plus prejudgment and post judgment interest as allowed by law, and all attorneys' fees, costs, and expenses incurred by Phillips 66 through trial of this matter.

Please call me immediately so we can discuss an amicable resolution of this matter.

Sincerely yours,

BEIRNE, MAYNARD & PARSONS, L.L.P.

Meagan P. Wilder

EXHIBIT G

BEIRNE, MAYNARD & PARSONS, L.L.P.

1300 POST OAK BOULEVARD

SUITE 2500

HOUSTON, TEXAS 77056-3000

MEAGAN P. WILDER

(713) 623-0887

FAX (713) 960-1527

DIRECT DIAL: (713) 871-6853
EMAIL: mwilder@BMPLLP.COM

April 17, 2014

Vinod Paul
550 Hawkcrest Circle
Sacramento, CA 95835

*Via CM-RRR and First Class Mail*

Re:     Personal Guaranty, effective July 25, 2002, executed by Vinod Paul

Dear Mr. Paul:

My firm represents Phillips 66 Company in regards to the collection of all amounts Reed Avenue Food Mart, LLC owes in connection with its Union 76 Branded Reseller Agreement with ConocoPhillips Company, as successor to Tosco Corporation by merger, dated February 14, 2002 ("Agreement").  Pursuant to the Personal Guaranty effective July 25, 2002, you unconditionally guaranteed all of Reed Avenue's present and future indebtedness to ConocoPhillips, including all amounts due under the Agreement.  ConocoPhillips has assigned the Agreement and Guaranty to Phillips 66.

From previous correspondence with Phillips 66, you know Reed Avenue breached the Agreement and failed to pay $406,848.70 that is due and owing to Phillips 66; thus, this amount is also due under your Guaranty.  Because prior attempts to resolve this matter have failed, Phillips 66 hereby makes a final demand for payment of the amounts owed under your Guaranty. You are advised that if payment in full is not received in my office within ten days of the date of this letter, or if you have not called me to make arrangements to satisfy the outstanding amounts owed by that date, I will advise Phillips 66 to file suit immediately to recover the principal amount owed plus prejudgment and post judgment interest as allowed by law, and all attorneys' fees, costs, and expenses incurred by Phillips 66 through trial of this matter.

Please call me immediately so we can discuss an amicable resolution of this matter.

Sincerely yours,

BEIRNE, MAYNARD & PARSONS, L.L.P.

Meagan P. Wilder

BEIRNE MAYNARD & PARSONS, L.L.P.
AUSTIN · DALLAS · HOUSTON · NEW ORLEANS · SAN ANTONIO

# EXHIBIT H

| Document Number | 1400020850 | Company Code | NAWC | Fiscal Year |
|---|---|---|---|---|
| Document Date | 10/01/2013 | Posting Date | 10/01/2013 | Period |
| Reference | | Cross-CC no. | | |
| Currency | USD | Texts exist | ☐ | |

### Items in Document Currency

| Itm | PK | BusA | Acct no. | Description | TC | Tax | Amount i |
|---|---|---|---|---|---|---|---|
| 001 | 06 | | 10052217 | REED AVENUE FOOD MA | | | 3 |
| 002 | 15 | | 10052217 | REED AVENUE FOOD MA | | | 4 |
| 003 | 09A | | 10052217 | REED AVENUE FOOD MA | | | |

Open items

| CoCd | PBk | Arre | PayT | Inv. ref. | Text | LC amnt | Doc. Date | Net due dt | Assignment |
|---|---|---|---|---|---|---|---|---|---|
| NAWC | L | 749 | NOR | 1400006193 | | 391,796.70 | 10/01/2013 | 03/26/2013 | EFT RETURN |
| NAWC | L | 721 | NOR | 1400008446 | 954606995 EFT Return 04/… | 52.00 | 04/23/2013 | 04/23/2013 | EFT RETURN |
| NAWC | A | 583 | N10 | V | NFL-655-GLB100522170813 | 232.88- | 08/28/2013 | 09/08/2013 | |
| * | | | | | | 391,615.82 | | | |



**Customer Line Item Display**

| Customer | 10052217 |
|---|---|
| Name | REEO AVENUE FOOD MART LLC |
| Address | 705 HARBOUR POINTE PLC |
| City | WEST SACRAMENTO |

A/P Contact          A/P Acct #
A/P Fax

| Document N | Reference | Billing Date | Payt | Net Due | Amount | DL Amount | Text |
|---|---|---|---|---|---|---|---|
| 954606995 | 0954606995 | 03/21/2013 | N30 | 04/20/2013 | 30 | 52.00 | NFL-622-GRIB04932020513 |
| 954226105 | 0954226105 | 02/13/2013 | N30 | 03/15/2013 | 6 | 90.00 | NFL-604-1703847 |
| 954517373 | 0954517373 | 03/12/2013 | NOR | 03/12/2013 | 9 | 123706.36 | NFL-655-6LB004032P |
| 954517374 | 0954517374 | 03/12/2013 | NOR | 03/12/2013 | 9 | 1,390.40 | NFL-655-6LBB04032I |
| 954524713 | 0954524713 | 03/12/2013 | NOR | 03/12/2013 | 9 | 261529.06 | NFL-655-0LB004632031213 |
| * | | | | | | 406648.70 | |

Prints Window Contents         PRD (1) 010   brtuxsapap01p   OVR

**Debit Memo**
Page 1 of 1

**Phillips 66 Company**
Federal Tax ID REDACTED

| | |
|---|---|
| **Invoice #:** | **954226105** |
| **INVOICE DATE:** | **02/13/2013** |
| **Due Date:** | **03/15/2013** |
| **Account #:** | **10052217** |
| **Pay Method:** | EFT |
| **Terms:** | Net 30 Days From Invoice Date |
| **Sales Info:** | NAW1-N2-NWNC W10-NAW088 |
| **Contract #** | |

**Bill To:** 10052217
REED AVENUE FOOD MART LLC
705 HARBOUR POINTE PLC
WEST SACRAMENTO CA 95691

**Ship To:** 804832
DELETED 2/11/2013
REED AVENUE FOOD MART LLC
705 HARBOUR POINTE PL
WEST SACRAMENTO CA 95691

**Loading #:**
**Site #:** 2639045

**Remittance Instructions:**
DO NOT PAY
Your account will be drafted on the invoice due date or next valid draft date.

| | |
|---|---|
| Transaction Date: 02/12/2013 | Transp: |
| BOL #: 1703847 | Brand: 76 |
| Plant: WEST SACRAMENTO, CA | |
| INCO Terms: Service-No Delivery Required | |
| Order #: 75991267 | |

| Material | Description | Net Vol (EA) | Price/Rate | Amount USD |
|---|---|---|---|---|
| 13402600 | Gilbarco PSO Maintenance Program | 1 | 90.00 | $90.00 |
| | GILBARCO PSO MAINT PROGRAM-01/16/2013 - 02/15/2013 | | | |
| Total | | | | $90.00 |
| | Invoice Total | | | **$90.00** |
| | Discount Amount | | | |
| | Amount Due | | | **$90.00** |

**For billing questions please call 888-766-9000**

**Debit Memo**

Page 1 of  1

**Phillips 66 Company**
Federal Tax ID REDACTED

| | |
|---|---|
| Invoice #: | 954517373 |
| INVOICE DATE: | 03/12/2013 |
| Due Date: | 03/12/2013 |
| Account #: | 10052217 |
| Pay Method: | EFT |
| Terms: | Net Upon Receipt From Invoice Date |
| Sales Info: | NAW1-N2-NWNC W10-NAW088 |
| Contract # | |

**Bill To:** 10052217
REED AVENUE FOOD MART LLC
705 HARBOUR POINTE PLC
WEST SACRAMENTO CA  95691

**Ship To:** 804832
DELETED 2/11/2013
REED AVENUE FOOD MART LLC
705 HARBOUR POINTE PL
WEST SACRAMENTO CA  95691

**Loading #:**
**Site #:**     2639045

Remittance Instructions:
DO NOT PAY
Your account will be drafted on
the invoice due date or next
valid draft date.

| | | |
|---|---|---|
| Transaction Date: 03/11/2013 | Transp: | |
| **BOL #:** GLB804832P | **Brand:** | 76 |
| **Plant:** WEST SACRAMENTO, CA | | |
| **INCO Terms:** Service-No Delivery Required | | |
| **Order #:** 76043127 | | |

| Material | Description | Net Vol (EA) | Price/Rate | Amount USD |
|---|---|---|---|---|
| 10772596 | Self Am Principal - NQ | 1 | 123,786.36 | $123,786.36 |
| | SELF AM FINAL PRINCIPAL BILLING | | | |
| Total | | | | $123,786.36 |
| | Invoice Total | | | $123,786.36 |
| | Discount Amount | | | |
| | Amount Due | | | $123,786.36 |

For billing questions please call 918-977-5935

**Debit Memo**

Page 1 of 1

**PHILLIPS 66**

Phillips 66 Company
Federal Tax ID REDACTED

| | |
|---|---|
| Invoice #: | 954517374 |
| INVOICE DATE: | 03/12/2013 |
| Due Date: | 03/12/2013 |
| Account #: | 10052217 |
| Pay Method: | EFT |
| Terms: | Net Upon Receipt From Invoice Date |
| Sales Info: | NAW1-N2-NWNC W10-NAW088 |
| Contract # | |

**Bill To:** 10052217
REED AVENUE FOOD MART LLC
705 HARBOUR POINTE PLC
WEST SACRAMENTO CA  95691

**Ship To:** 804832
DELETED 2/11/2013
REED AVENUE FOOD MART LLC
705 HARBOUR POINTE PL
WEST SACRAMENTO CA  95691

**Loading #:**
**Site #:**    2639045

Remittance Instructions:
DO NOT PAY
Your account will be drafted on
the invoice due date or next
valid draft date.

| | |
|---|---|
| Transaction Date: 03/11/2013 | Transp: |
| BOL #:  GLB8048321 | Brand:   76 |
| Plant:  WEST SACRAMENTO, CA | |
| INCO Terms:  Service-No Delivery Required | |
| Order #:  76043128 | |

| Material | Description | Net Vol (EA) | Price/Rate | Amount USD |
|---|---|---|---|---|
| 10772597 | Self Am Interest - NQ | 1 | 1,390.48 | $1,390.48 |
| | SELF AM FINAL INTEREST BILLING | | | |
| Total | | | | $1,390.48 |
| | Invoice Total | | | $1,390.48 |
| | Discount Amount | | | |
| | Amount Due | | | $1,390.48 |

For billing questions please call 918-977-5935

**Debit Memo**

Phillips 66 Company
Federal Tax ID REDACTED

| | |
|---|---|
| Invoice #: | 954524713 |
| INVOICE DATE: | 03/13/2013 |
| Due Date: | 03/12/2013 |
| Account #: | 10052217 |
| Pay Method: | EFT |
| Terms: | Net 30 Days |
| | From Invoice Date |
| Sales Info: | NAW1-N2-NWNC |
| | W10-NAW088 |
| Contract # | |

**Bill To:** 10052217
REED AVENUE FOOD MART LLC
705 HARBOUR POINTE PLC
WEST SACRAMENTO CA  95691

**Ship To:** 804832
DELETED 2/11/2013
REED AVENUE FOOD MART LLC
705 HARBOUR POINTE PL
WEST SACRAMENTO CA  95691

**Loading #:**
**Site #:**    2639045

Remittance Instructions:
DO NOT PAY
Your account will be drafted on
the invoice due date or next
valid draft date.

---

**Transaction Date: 03/12/2013**
**BOL #:**        DLB804832031213
**Plant:**        WEST SACRAMENTO, CA
**INCO Terms:**   Service-No Delivery Required
**Order #:**      76045408

**Transp:**
**Brand:**        76

| Material | Description | Net Vol (EA) | Price/Rate | Amount USD |
|---|---|---|---|---|
| 11351892 | LIQ DAM - RSLR CONTRACT | 1 | 281,529.86 | $281,529.86 |
| | Reseller Liquidated Damages (clawback) | | | |
| Total | | | | $281,529.86 |
| | Invoice Total | | | $281,529.86 |
| | Discount Amount | | | |
| | Amount Due | | | $281,529.86 |

For billing questions please call 918/977/4524

**PHILLIPS 66**

Phillips 66 Company
Federal Tax ID REDACTED

**Debit Memo**
Page 1 of 1

| | |
|---|---|
| Invoice #: | **954606995** |
| INVOICE DATE: | **03/21/2013** |
| Due Date: | **04/20/2013** |
| Account #: | **10052217** |
| Pay Method: | EFT |
| Terms: | Net 30 Days |
| | From Invoice Date |
| Sales Info: | NAW1-N2-NWNC |
| | W10-NAW088 |
| Contract # | |

**Bill To:** 10052217
REED AVENUE FOOD MART LLC
705 HARBOUR POINTE PLC
WEST SACRAMENTO CA 95691

**Ship To:** 804832
DELETED 2/11/2013
REED AVENUE FOOD MART LLC
705 HARBOUR POINTE PL
WEST SACRAMENTO CA 95691

**Loading #:**
**Site #:** 2639045

Remittance Instructions:
DO NOT PAY
Your account will be drafted on
the invoice due date or next
valid draft date.

| | | |
|---|---|---|
| Transaction Date: 03/20/2013 | Transp: | |
| BOL #: BRI804832020513 | Brand: | 76 |
| Plant: WEST SACRAMENTO, CA | | |
| INCO Terms: Service-No Delivery Required | | |
| Order #: 76062285 | | |

| Material | Description | Net Vol (EA) | Price/Rate | Amount USD |
|---|---|---|---|---|
| 11357139 | SPIRIT OF PERFORMANCE | 1 | 52.00 | $52.00 |
| | CHARGE TO THE FEBRUARY SPIRIT OF PERFORMANCE PROG | | | |
| Total | | | | $52.00 |
| | Invoice Total | | | $52.00 |
| | Discount Amount | | | |
| | Amount Due | | | $52.00 |

For billing questions please call xx nonfuel xx.